**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **FINLEY ALEXANDER WEALTH** | * | |
| **MANAGEMENT, LLC,** *et al.*, | | |
| | * | |
| **Plaintiffs,** | | |
| **v.** | * | **Case No.: GJH-19-1312** |
| | | |
| **M&O MARKETING, INC.,** *et al.*, | * | |
| | | |
| **Defendants.** | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**MEMORANDUM OPINION**

Plaintiffs Finley Alexander Wealth Management, LLC ("Finley Alexander") and Kyle Winkfield brought this civil action against Defendant M&O Marketing, Inc. ("M&O") and individual Defendants Dennis Brown, Edward Petersmarck, and Ryan Brown. ECF No. 1. In their original complaint, Plaintiffs alleged claims of fraud and fraudulent concealment based on Defendants' methods of inducing Plaintiffs to enter into a business relationship with M&O and claims of tortious interference with contracts, tortious interference with prospective business advantage, defamation *per se*, defamation, invasion of privacy false light, and slander based on Defendants' attempts to damage Plaintiffs' business after the parties' business relationship had ended. *Id.* In response to Plaintiffs' Complaint, Defendant filed a Motion to Dismiss, ECF No. 15, which the Court granted on March 20, 2020, ECF Nos. 36, 37. Pending before the Court now is Plaintiffs' Motion for Leave to Amend Complaint. ECF No. 38. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the following reasons, Plaintiffs' Motion for Leave to Amend Complaint is granted, in part, and denied, in part.

I.    **BACKGROUND**[1]

A.    **Parties**

Plaintiff Finley Alexander is a financial advisory firm run by Plaintiff Winkfield, a Maryland-based financial advisor. ECF No. 38-2 ¶¶ 1, 11, 12. Plaintiffs sell investment and insurance products to Maryland-based clients. *Id.* Plaintiff Winkfield previously worked for O'Dell, Winkfield, Roseman & Shipp, LLC ("OWRS"), a predecessor to Finley Alexander also based in Maryland. *Id.* ¶ 11.

Defendant M&O is a conglomeration of at least eight entities run out of an office in Southfield, Michigan. *Id.* ¶ 13. M&O provides marketing, regulatory, compliance, and back-office services to its clients, including developing and implementing life insurance and annuities sales strategies, coordinating local television appearances, preparing sales seminars, and providing client-specific advice for marketing to particular customers. *Id.* ¶¶ 3, 23, 105. M&O advertises itself as "a best-in-class financial marketing behemoth offering highly skilled marketing professionals, with quality resumes and deep training." *Id.* ¶ 103.

Defendant Dennis Brown is the owner and CEO of M&O. *Id.* ¶ 14. Defendant Petersmarck is the Executive Director of Practice Development at M&O and Defendant Ryan Brown is counsel at M&O. *Id.* ¶¶ 15, 16.

B.    **Business Relationship**

In September 2014, Defendant Petersmarck cold-called Plaintiff Winkfield on behalf of M&O to solicit Plaintiff Winkfield's business. *Id.* ¶ 18. Defendant Petersmarck's cold-call was the first of a series of communications between Plaintiff Winkfield and Defendants Dennis Brown, Petersmarck, and Ryan Brown, during which Defendants convinced Plaintiff Winkfield

---

[1] Unless otherwise stated, the background facts are taken from Plaintiff's proposed Amended Complaint, ECF No. 38-2, and are presumed to be true.

that M&O was capable of providing best-in-class services—a claim supported by Plaintiff

Winkfield's conversations with industry colleagues and other M&O clients. *Id.* ¶¶ 19–20, 114–

15, 117–18, 121. As a result of the communications between the parties and Defendants' claims

of sophistication, size, and resources, Plaintiff Winkfield chose, in February 2015, to retain

M&O to provide marketing, regulatory, compliance, and back-office services for his financial

advisory business. *Id.* ¶¶ 22, 119.

From the formation of the parties' business relationship in February 2015 until the

relationship ended in January 2019, Defendants and Plaintiff Winkfield remained in frequent

communication—sometimes in person in Maryland—regarding the services provided by M&O.

*Id.* ¶¶ 25, 120. Defendants repeatedly emphasized during these communications that the services

M&O provided to Plaintiffs were designed to bolster and enhance Plaintiff Winkfield's

credibility as a financial advisor in the Maryland market. *Id.* ¶ 24. Throughout this period,

Plaintiffs' main contact at M&O was Defendant Petersmarck. *Id.* ¶ 41.

During the parties' business relationship, M&O was compensated based on Plaintiff

Winkfield's sales to his largely Maryland-based customers. *Id.* ¶ 25. This compensation,

combined with compensation received from Plaintiff Winkfield's former partners, accounted for

a substantial portion of M&O's revenue. *Id.* ¶ 39.

At some point during their business relationship, Plaintiffs learned information about

Defendants that was inconsistent with Defendants' claims of size, sophistication, and resources.

First, Plaintiffs discovered that the sales materials Defendant M&O provided were

unsophisticated to the extent of being largely unusable. *Id.* ¶ 116. Second, Plaintiffs learned that

Defendant Petersmarck "had been convicted of gun and drug felonies, which disqualified him

from obtaining a license to sell insurance without a waiver from the State Insurance

3

Commissioner." *Id.* ¶ 104. According to Plaintiffs, Defendant Petersmarck's record is

"antithetical to the regulatory and compliance services that M&O was hired to provide" and

should have disqualified him from working for a sophisticated entity, like M&O claimed to be.

*Id.* ¶¶ 104–05. Third, Plaintiffs discovered that Defendant Ryan Brown, M&O's general counsel

during the period relevant to this action, was Defendant Dennis Brown's son and was only barred

in Michigan a few months prior to the formation of the parties' business relationship. *Id.* ¶ 107.

Plaintiffs allege this information is evidence that Defendants' claims of sophistication and

resources were misleading. *Id.* ¶ 108. Moreover, Plaintiffs allege that Defendant Ryan Brown's

lack of qualifications led to the harm caused by the defamatory letter described below. *Id.*

¶¶ 108–10; *see infra* § I.C.2. Fourth, Plaintiffs learned that a financial advisor with one of

Defendant Dennis Brown's other companies, an affiliate of M&O, was arrested and charged with

embezzlement and that Defendant Dennis Brown and his company had tried to "lowball the

victims" rather than make them whole. *Id.* ¶¶ 125–28. Plaintiffs claim this information would

have prevented them from hiring Defendants had they known it beforehand. *Id.* Fifth, and finally,

Plaintiffs discovered that Defendant M&O had retaliated against an employee who filed a

meritorious employment discrimination complaint with the United States Equal Opportunity

Employment Commission. *Id.* ¶¶ 129–30. Again, Plaintiffs allege that knowledge of this

behavior would have caused Plaintiffs not to hire Defendants. *Id.*

Plaintiffs allege that the troubling information they discovered about Defendants was

originally concealed from them through Defendants' use of an IT consultant, Digital Brand

Management, Inc. ("DBM"). *Id.* ¶ 131. Defendants use DBM "to diminish the likelihood that the

advisors [like Plaintiffs] will discover" negative information while conducting due diligence on

Defendants. *Id.*

### C.  Events After the Termination of the Business Relationship

In January 2019, the parties terminated their business relationship. *Id.* ¶ 37. Plaintiffs allege that as a result of this termination, Defendants entered "into a conspiracy agreement and understanding to destroy Plaintiffs' Maryland-based business . . . by implementing four sequential attacks designed to ruin Plaintiffs' reputation[.]" *Id.* ¶ 42. (1) Defendant Petermarck posted a statement on a website called Ripoff Report (the "Ripoff Post") with false fraud allegations based on confidential client information under the control of Defendant Dennis Brown and handled under "protocols and procedures" for which Ryan Brown was responsible. *Id.* ¶ 43 (2) Defendant Ryan Brown, with the blessing of Defendant Dennis Brown and using information provided by Defendant Petersmarck, sent a defamatory letter to Plaintiff Winkfield's former OWRS partners "at a critically damaging juncture" (the "Brown Letter"). *Id.* (3) Defendants deprived Plaintiffs of their public relations advisor, Ms. Spencer-Tiemann—in the middle of the public relations mess created by Defendants—by filing a Michigan lawsuit against her. *Id.* (4) Defendants released confidential client information to Plaintiffs' competitor Jeff Klauenberg, an M&O client, in order to facilitate Mr. Klauenberg's attempts to win Plaintiffs' Maryland clients "through false and defamatory misstatements misrepresenting the confidential information the Defendant conspirators provided to him[.]" *Id.*

### 1.     The Ripoff Post

On March 9, 2019, with the blessing of Defendants Dennis and Ryan Brown, Defendant Petersmarck anonymously posted a statement on a website called Ripoff Report, "accusing Plaintiff Winkfield of having 'attempted to defraud' a client" and "warning 'BEWARE!'" *Id.* ¶¶ 53, 56; ECF No. 1-9. Despite the anonymity with which the Ripoff Post was posted, Plaintiffs knew Defendant Petersmarck created the post because it included confidential financial

information regarding one of Plaintiff Winkfield's clients known only to that client, Plaintiffs, and Defendants. ECF No. 38-2 ¶ 54. The client denied any involvement in creating or uploading the post and Defendant Petersmarck has since admitted, through counsel, to uploading the Ripoff Post. *Id.* ¶¶ 53, 54.

Plaintiffs allege that several statements included in the Ripoff Post were false—*e.g.*, (1) Plaintiff Winkfield "falsely promised a 'bonus' to a former Maryland client when 'there was no real 'bonus'' (there, in fact, ***was*** a bonus)[;]" and (2) Plaintiff Winkfield falsely promised the client would be "'made whole . . . That was simply not true'—in reality, the client ***was*** made whole[.]" ECF No. 38-2 ¶ 55 (emphasis in original); *see* ECF No. 1-9. Defendants knew these statements to be false because Defendants "specifically assisted [Plaintiff] Winkfield in addressing the client complaint that is referenced in the Ripoff Post." ECF No. 38-2 ¶¶ 224, 241, 270.

In the aftermath of the Ripoff Post, Plaintiffs lost a Maryland financial advisor, Jacob Serfas, who "felt it necessary to leave Finley Alexander because of the negative stigma that the Ripoff Post placed on the firm[.]" *Id.* ¶¶ 58–60. Plaintiffs had introduced Mr. Serfas to the financial advisory business, had spent substantial resources training him, and had received substantial commission revenue from Mr. Serfas' Maryland clients. *Id.* However, despite his positive relationship with Plaintiffs, Mr. Serfas left Plaintiffs' financial advisory business to get "'out from under' the cloud over the Finley Alexander name that has now been tarnished by the Ripoff Post." *Id.*

The Ripoff Post also caused Plaintiffs to lose business they would otherwise have won. "The number of clients that have decided against signing with Finley Alexander after attending one of [Plaintiff] Winfield's seminars and scheduling an initial conference has spiked" since

Defendant Petersmarck uploaded the Ripoff Post. *Id.* ¶¶ 62, 200. Specifically, Plaintiffs have identified over 100 potential clients who took initial steps toward signing on with Plaintiff— attending one of Plaintiffs' seminars and then scheduling or attending a one-on-one meeting with Plaintiff Winkfield—only to later cancel the sign-on process. *Id.* ¶¶ 63, 65, 202–03, 244. Cancellations of this sort were "virtually unheard of prior to the Ripoff Post." *Id.* ¶ 65. Moreover, some of these potential clients have specifically identified the Ripoff Post as the reason for ending their consideration of Plaintiffs' financial advisory services or as a consideration in hiring a different financial advisor. *Id.* ¶ 64.

### 2. Defendant Ryan Brown's Defamatory Letter

On March 25, 2019, Defendant Ryan Brown, M&O's then in-house counsel, sent a "threatening letter to Plaintiffs' former OWRS business partners" claiming that Plaintiff Winkfield and his former partners had misappropriated M&O's materials and used copyrighted materials without permission. *Id.* ¶ 44; ECF No. 1-10. Specifically, the letter stated that Plaintiff Winkfield and his former business partners, "under the Registered Investment Advisor, Retirement Capital Planners, LLC, . . . have continued to utilize copyrighted materials that are the intellectual property of M&O Marketing, Inc." and that M&O reserved the right to contact state and federal regulators to resolve the issue. ECF No. 1-10. The copyrighted materials referenced in the letter "are the insurance sales and solicitation slide shows and other written materials that Defendants prepared" as part of the services M&O provided to Plaintiffs prior to the termination of the business relationship, materials that were specifically designed to comply with Maryland law. ECF No. 38-2 ¶¶ 45–46. In the year since the letter was sent, "Plaintiffs have not made any change to their materials" based on the Brown Letter, yet Defendants have not filed any of the civil or administrative actions against Plaintiffs threatened in the letter. *Id.* ¶ 47.

Plaintiffs allege that this is in part because Plaintiff Winkfield "did not even use Defendants' sales materials when he was working with M&O, and Defendants knew that when they sent the letter[]." *Id.* ¶ 170.

Defendant Ryan Brown sent the threatening letter at a time when Defendants knew that Plaintiff Winkfield and his former OWRS partners "were each particularly vulnerable, each just getting started on his own" and at time when Plaintiff Winkfield was not in a position to defend against the actions threatened by the letter. *Id.* ¶ 48 ("The prospect of investing time and resources defending meritless copyright allegations had the potential to undermine the new business[.]"). The letter "was a targeted attempt to shake the relationships between the OWRS partners after they left M&O, not a legitimate attempt to put Plaintiffs on notice of viable copyright or misappropriation claims[,]" of which there are none. *Id.* ¶¶ 47–48. In this respect, the letter succeeded; the letter "exacerbated a tense breakup of OWRS . . . causing Plaintiffs damages in the form of lost time and resources invested to address those false allegations, as well as missed opportunities to earn additional fees from former OWRS partners whose trust in Plaintiffs was tarnished by the Letter." *Id.* ¶ 171. Additionally, Plaintiffs allege that the letter was unlawful because it proposes "an unlawful forbearance agreement." *Id.* ¶ 50.

### 3.    Michigan Lawsuit Against Plaintiffs' Public Relations Executive

On May 30, 2019, Defendants sent a demand letter, *id.* at 130–33,[2] to Aimee Spencer-Tiemann, a public relations specialist working for Plaintiffs, and then, on June 14, 2019, filed a lawsuit against her in Michigan, *id.* at 90–103, 134. *Id.* ¶¶ 66–67. These actions were taken to retaliate against Plaintiffs for filing the instant litigation.

---

[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

Ms. Spencer-Tiemann formerly worked for Defendant M&O but left that employment on November 7, 2017. *Id.* ¶ 67. While Plaintiffs were unaware that Ms. Spencer-Tiemann was bound by a two year non-compete agreement when Plaintiff Winkfield hired her, Plaintiff Winkfield, as a courtesy, asked Defendant Dennis Brown in late 2017 whether he had any objections to Plaintiffs working with Ms. Spencer-Tiemann. *Id.* ¶¶ 67–68. Defendant Dennis Brown responded that "he did *not* have *any* issue with Plaintiffs retaining Ms. Spencer-Tiemann to perform public relations services for Plaintiffs." *Id.* ¶ 69 (emphasis in original).

Defendants did not initiate litigation against Ms. Spencer-Tiemann nor seek to enforce Ms. Spencer-Tiemann's non-compete in 2017, 2018, nor in the first half of 2019. *Id.* ¶¶ 70–72. Rather, Defendants filed the Michigan lawsuit five weeks after Plaintiffs initiated this litigation. *Id.* ¶¶ 66, 70–72. Defendants ultimately obtained an injunction prohibiting Plaintiffs from working with Ms. Spencer-Tiemann for the last three months of her two-year non-compete period, "which exacerbated the ever-increasing damages that Plaintiffs sustained from the Ripoff Post, because the injunction stopped Ms. Spener-Tiemann from attempting to mitigate those damages." *Id.* ¶ 74. Plaintiffs allege that Defendants filed the Michigan lawsuit specifically to harm Plaintiffs. *Id.* ¶ 80.

### 4.    Jeff Klauenberg's False and Defamatory Misstatements to Plaintiffs' Clients

Three months after Plaintiffs filed the instant civil action, Defendants "provided Plaintiffs' confidential list of Maryland clients to a competing Maryland financial advisor, whose business uses M&O for Services, so that the competing advisor would, and did, e-mail those clients to try to lure them to switch from Plaintiffs to the M&O advisor." *Id.* ¶ 83. Specifically, Plaintiffs allege that CoreCap Advisors and CoreCap Invesments, Inc. ("Corecap")—an affiliate of M&O whose director is Defendant Dennis Brown—terminated Plaintiff Winkfield's CoreCap

appointment days before the Ripoff Post was uploaded and then contacted Mr. Klauenberg, provided him with Plaintiffs' confidential list of Maryland clients, and directed Mr. Klauenberg to misappropriate those clients. *Id.* ¶¶ 85–86, 88. Consequently, Mr. Klauenberg, a competitor of Plaintiffs, sent Plaintiffs' Maryland clients a blast email (the "Klauenberg Blast E-Mail"), *id.* at 136–137, introducing himself and making a sales pitch based on the claim that Plaintiff Winkfield is "overcharging his clients." *Id.* ¶¶ 87, 92. Plaintiffs label the Klauenberg Blast E-Mail as "false and defamatory" and allege that Mr. Klauenberg's misstatements are the result of Corecap providing "limited and incomplete information[.]" *Id.* ¶¶ 92, 95. Plaintiffs allege that Defendants' purpose for providing the confidential client information used by Mr. Klauenberg was "to deprive Plaintiffs of the ongoing revenues generated by these Maryland clients while simultaneously restoring the revenue stream arising from these clients to M&O." *Id.* ¶ 84.

### D.   Present Litigation

On May 3, 2019, Plaintiff filed a Complaint against Defendants in this Court alleging fraud (Count I), fraudulent concealment (Count II), tortious interference with contracts (Count III), tortious interference with prospective business advantage (Count IV), defamation *per se* (Count V), defamation (Count VI), invasion of privacy false light (Count VII), and slander (Count VIII). On July 2, 2019, Defendants filed a Motion to Dismiss for lack of personal jurisdiction and failure to state a claim. ECF No. 15. The Court issued a Memorandum Opinion and Order granting Defendants' Motion to Dismiss on March 20, 2020. ECF Nos. 36, 37.

Plaintiffs filed the instant Motion for Leave to Amend Complaint on April 10, 2020, ECF No. 38, attaching their proposed Amended Complaint, ECF No. 38-2. The proposed Amended Complaint includes the same eight claims that were in the original complaint—with additional factual allegations intended to address the deficiencies the Court previously identified—as well

as an additional claim of conspiracy. ECF No. 38-2. Defendants responded in opposition on

August 19, 2020, ECF No. 46, and Plaintiffs replied on September 2, 2020, ECF No. 47.

However, Plaintiffs' Reply includes a revised proposed Amended Complaint that adds four new

claims: a negligent misrepresentation claim, two claims of negligent hiring/supervision/retention,

and a negligence claim. ECF No. 47-1.[3]

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 15(a)(2) provides that courts "should freely give leave"

to parties to amend pleadings "when justice so requires." Fed. R. Civ. P. 15(a)(2). "This liberal

rule gives effect to the federal policy in favor of resolving cases on their merits instead of

disposing of them on technicalities." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006). The

Fourth Circuit has "interpreted Rule 15(a) to provide that 'leave to amend a pleading should be

denied only when the amendment would be prejudicial to the opposing party, there has been bad

faith on the part of the moving party, or the amendment would have been futile.'" *Id.* (quoting

*Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986)); *see also Mayfield v. Nat'l

Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 379 (4th Cir. 2012). "Futility is apparent if

the proposed amended complaint fails to state a claim under the applicable rules and

accompanying standards," and would therefore not survive a motion to dismiss pursuant to Rule

12(b)(6).  *Davison v. Randall*, 912 F.3d 666, 690 (4th Cir. 2019) (quoting *Katyle v. Penn Nat'l

Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011)).

---

[3] Plaintiffs filed their Motion for Leave to Amend Complaint, ECF No. 38, which attached a proposed Amended Complaint, ECF No. 38-2, and their Reply in Support of Plaintiffs' Motion for Leave to Amend Complaint, ECF No. 47, which attached a revised proposed Amended Complaint, ECF No. 47-1, under seal with accompanying Motions to Seal Portions of Amended Complaint, ECF Nos. 39, 48. Because both Motions to Seal are unopposed and only seek to seal small portions of the record, the Court grants both Motions.

To state a claim that survives a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The "mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012). The Court accepts "all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). The Court must also "draw all reasonable inferences in favor of the plaintiff." *Id.* at 253 (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)). "[B]ut [the Court] need not accept the legal conclusions drawn from the facts, and . . . need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Id.* (first alteration in original) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

"Under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider exhibits, without converting the motion to dismiss to one for summary judgment." *Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 501 (D. Md. 2019) (citing *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015)). "In particular, a court may consider documents that are 'explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits . . . .'" *Id.* (ellipsis in original) (quoting *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016)). The Court may also "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166. "To be integral, a document must be one that by its very

12

existence, and not the mere information it contains, gives rise to the legal rights asserted."

*Brennan*, 361 F. Supp. 3d at 502 (emphasis and internal quotation marks omitted) (quoting

*Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D.

Md. 2011)).

## III.   DISCUSSION

Defendants argue that the Court should deny Plaintiffs' request to amend their complaint

for two reasons: (1) the amendment would be futile; and (2) Plaintiffs have acted in bad faith by

including frivolous allegations in their proposed Amended Complaint. ECF No. 46 at 2–3. The

Court addresses each of Defendants arguments separately below.[4]

### A.   Futility

Defendants' first argument is that Plaintiffs' proposed amendment is futile—*i.e.*, none of

the claims outlined in the proposed Amended Complaint would survive a motion to dismiss. The

Court addresses Defendants' futility argument as to each of Plaintiff's claims below.

### 1.   Fraud-Based Claims (Counts I and II)

In Maryland, a fraud claim can be based on an affirmative misrepresentation or a

nondisclosure or concealment of a material fact. *See Hoffman v. Stamper*, 867 A.2d 276, 292

n.12 (Md. 2005). Plaintiffs allege in their proposed Amended Complaint, as they did in their

original Complaint, fraud-based claims under both of these theories. The Court will discuss each

theory separately.

---

[4] For the purposes of deciding the instant Motion for Leave to Amend Complaint, ECF No. 38, the Court is only considering the proposed Amended Complaint attached to the Motion, ECF No. 38-2. If Plaintiffs wish the revised Amended Complaint attached to their reply brief to become the operative pleading in this action, Plaintiffs must file an additional motion for leave to amend complaint. Given the amount of time that has already elapsed, however, and the fact that certain claims will move forward, any further attempts to amend will be done, if at all, in parallel with the commencement of discovery.

### a.       Affirmative Misrepresentations (Count I)

To state a claim for fraud based on affirmative misrepresentations, the plaintiff must plead that "(1) the defendant made a false statement of fact; (2) the defendant knew the statement was false or acted with reckless disregard for the truth of the statement; (3) the defendant made the statement for the purpose of defrauding the plaintiff; (4) the plaintiff reasonably relied on the false statement; and (5) the plaintiff was damaged as a result." *Marchese v. JPMorgan Chase Bank, N.A.*, 917 F. Supp. 2d 452, 465 (D. Md. 2013) (citations omitted). "Reasonable, detrimental reliance upon a misrepresentation is an essential element of a cause of action for fraud, and such reliance must be pleaded with particularity." *Steven B. Snyder, M.D., P.A. v. Cynosure, Inc.*, No. RDB-18-2049, 2019 WL 1386727, at *6 (D. Md. Mar. 27, 2019) (internal quotation marks omitted) (quoting *Learning Works, Inc. v. The Learning Annex, Inc.*, 830 F.2d 541, 546 (4th Cir. 1987)).

Plaintiffs claimed in their original Complaint that Defendants falsely represented that M&O was a "billion dollar marketing organization" run by a "genius" and "savant" and that Dennis Brown was the sole owner of M&O. ECF No. 1 ¶¶ 4, 22–30, 33, 82. The Court dismissed Plaintiffs' affirmative misrepresentation claims because the "Complaint fail[ed] to sufficiently plead with particularity Defendants' false statements of fact, how Plaintiffs reasonably relied on them, and the damage they suffered as a result." ECF No. 36 at 22. In particular, the Court found that (1) "the Complaint refer[ed] only to false statements made by M&O or by Defendants collectively, ECF No. 1 ¶¶ 22, 28, thus lacking the required particularity as to each individual Defendants' involvement in the fraud," ECF No. 36 at 22–23; (2) "the Complaint fail[ed] to allege when Plaintiffs viewed the alleged misrepresentations on M&O's website or when they heard them and from whom, why these misrepresentations were material to Plaintiffs' decision to

enter a business relationship with Defendants, or how they reasonably relied on them[,]" *id.* at 23; (3) Plaintiff's "specific allegations . . . fail to support a claim because they are vague generalities, statements of opinion, or puffery—which are deemed non-cognizable[,]" *id* at 23 n.13 (internal quotation marks omitted); and (4) "the Complaint lack[ed] any allegations as to the harm Plaintiffs suffered as a result of their reliance on the alleged misrepresentations[,]" *id.* at 24.

Plaintiffs proposed Amended Compliant corrects many of these deficiencies, but not all. Specifically, Plaintiffs still fail to plead with particularity affirmative misrepresentations that are not "vague generalities, statements of opinion, or puffery[.]" *Baney Corp .v. Agilysys NV, LLC*, 773 F. Supp. 2d 593, 608 (D. Md. 2011); *Dierker v. Eagle Nat'l Bank*, 888 F. Supp. 2d 645, 651 (D. Md. 2012) (stating that a fraud claim cannot "arise out of opinions or mere puffery— statements that are extravagant in scope and measure and elusive in meaning." (footnote and internal quotation marks omitted)).

In their Amended Complaint, Plaintiffs allege that Defendants:

- "overstat[ed] their own skills, sophistication, size and resources[,]" ECF No. 38-2 ¶ 3;

- "made misrepresentations . . . in order to deceive [Plaintiff] Winkfield into believing M&O and the Defendants had the capability of providing best-in class Services[,]" *id.* ¶ 20;

- "intentionally and painstakingly communicated an overstated and false impression of their size, sophistication, skills, and resources[,]" *id.* ¶ 101;

- "intentionally misled Plaintiffs to believe that M&O is a best-in-class financial marketing behemoth offering highly skilled marketing professional, with quality resumes and deep training" and "deliberately created the false impression that M&O had the resources to attract the highest quality job applicants to serve its clients[,]" *id.* ¶ 103;

- misrepresented M&O's sophistication in order to mislead Plaintiffs into believing that "M&O had the resources to offer highly skilled attorneys who could provide Plaintiffs much-needed guidance to navigate Maryland's complex financial and insurance regulatory landscape[,]" *id.* ¶ 106;

- "reiterated [their] misstatements of Defendants' size, sophistication, skills and resources[,]" *id.* ¶ 111;

- "overstate[d] to the general public that it is [a] highly sophisticated 'billion dollar marketing organization,' owned and operated by a 'genius' and 'savant[,]'" *id.* ¶ 112;

- "claim[ed] that M&O was a billion-dollar organization with the resources to provide Plaintiffs best-in-class Services[,]" *id.* ¶ 115; and

- "reiterated their overstatements of M&O's size, skills, sophistication and resources, and again misrepresented their own and M&O's respective expertise and qualifications[,]" *id.* ¶ 118.

These allegations are insufficient to withstand a motion to dismiss. In alleging fraud or mistake, under Fed. R. Civ. P. 9(b), "a party must state with particularity the circumstances constituting fraud or mistake." *My Nat'l Tax & Ins. Servs., Inc. v. H & R Block Tax Servs., Inc.*, 839 F. Supp. 2d 816, 818 (D. Md. 2012). "To satisfy this standard, plaintiffs 'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Id.* (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008)). Plaintiffs' allegations fail to detail the "contents of the false representations." *Id.* Instead, Plaintiffs merely assert that Defendants' intentionally misleading statements induced Plaintiff Winkfield to have specific beliefs—*e.g.*, "that M&O is a best-in-class financial marketing behemoth offering highly skilled marketing professionals, with quality resumes and deep training" and "had the resources to attract the highest quality job applicants to serve its clients[,]" ECF No. 38-1 ¶ 103. Plaintiffs do not specify the misstatements that induced Plaintiffs to have these beliefs. While it is not required that Plaintiffs' allegations "contain actual quotations or precise details," they must "adequately put Defendants on notice of which statements are the subject of dispute, and constitute more than conclusory or speculative allegations of fraud." *Giannaris v. Cheng*, 219 F. Supp. 2d 687, 695 (D. Md. 2002). Plaintiffs need not outline the

transcript of conversations in which Defendants allegedly misled them, but they should allege specific examples of Defendant's misrepresentations. *See Nordstrom, Inc. v. Schwartz*, No. GJH-18-3080, 2019 WL 4221475, at *5 (D. Md. Sept. 5, 2019) (citing *Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 474 (D. Md. 2009) (finding that the complaint satisfied Rule 9(b) where it alleged the general content of the defendants' fraudulent scheme and provided detailed examples of the types of fraudulent activities engaged in by the defendants, including times and locations)). Plaintiffs' have not provided these necessary "specific examples" in their proposed Amended Complaint.

Even if the Court assumes that Plaintiffs' allegations that Defendants "intentionally and painstakingly communicated an overstated and false impression of their size, sophistication, skills, and resources[,]" *id.* ¶ 101, are sufficiently specific to satisfy the pleading requirements of Fed. R. Civ. P. 9(b), these statements are still non-actionable puffery. *McGraw v. Loyola Ford, Inc.*, 723 A.2d 502, 512–13 (Md. Ct. Spec. App. 1999) (holding that statements that amount to "indefinite generality[,]" "puffing[,]" and "sales talk" cannot give rise to a fraud claim because such statements are "'offered and understood as an expression of the seller's opinion only, which is to be discounted as such by the buyer, and on which no reasonable [person] would rely'"); *see e.g.*, *Baney Corp.*, 773 F. Supp. at 609 (finding that "Defendant's statement that the program would be 'easy to use and perfect for a multi-property environment,' . . . is too much like an opinion to constitute a misstatement of fact, and it is too vague to justify reliance."); *Steigerwald v. Bradley*, 136 F. Supp. 2d 460, 469–70 (D. Md. 2001) (finding that Defendant's statement that he was one of the bank's "biggest and best customers" was not a material misrepresentation but non-actionable puffing); *Milkton v. French*, 150 A. 28, 31–32 (Md. 1930) (finding "the use of the term 'perfectly safe' in connection with every detail of construction was so extravagant in scope

17

and measure and so indefinite and elusive in meaning that the statement would fall within the category of a puff instead of a representation[.]").

Because Plaintiff has not pleaded with particularity actionable misrepresentations made by Defendants, Plaintiff's affirmative misrepresentations fraud claim will not withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6) and Plaintiffs' proposed Amended Complaint is futile with respect to that claim. The Court thus denies Plaintiffs' Motion for Leave to Amend Complaint as to Count I (Fraud/False Pretenses/Misrepresentation).[5]

### b.    Fraudulent Concealment (Count II)

To state a claim for fraud based on concealment or nondisclosure, Plaintiffs must prove that "(1) Defendant owed Plaintiff a duty to disclose a material fact; (2) Defendant failed to disclose that fact; (3) Defendant intended to defraud or deceive Plaintiff; (4) Plaintiff took action in justifiable reliance on the concealment; and (5) Plaintiff suffered damages as a result of Defendant's concealment." *Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.*, 262 F. Supp. 2d 618, 628–29 (D. Md. 2003) (citing *Green v. H & R Block, Inc.*, 735 A.2d 1039, 1059 (Md. 1999)). The plaintiff "must prove *either* that Defendant had a duty to disclose a material fact to them and failed to do so, or that Defendant concealed a material fact for the purpose of defrauding

---

[5] The Court's conclusion is also supported by deficiencies in Plaintiffs' allegations regarding reasonable reliance and damages. *Meerkreebs v. Astor & Sanders Corp.*, No. PWG-17-695, 2018 WL 1211539, at *3 (D. Md. Mar. 7, 2018) ("Under Maryland law, reasonable reliance and resulting injury are elements of . . . intentional misrepresentation, also referred to as fraud or deceit[.]" (footnotes omitted)). Plaintiffs allege that "[i]n reliance on all of those misrepresentations, Plaintiffs retained Defendants" and "paid Defendants substantial sums." ECF No. 38-2 ¶¶ 119, 143. However, Plaintiffs' allegations that they retained Defendants because of Defendants' misrepresentations are undercut by Plaintiffs' allegations that Plaintiffs "asked industry colleagues about Defendants' reputations," including one of M&O's Maryland clients, and relied on the positive reviews they received from those inquiries in hiring Defendants. *Id.* ¶ 121. Additionally, Plaintiffs' allegations that, due to their reasonable reliance, they paid Defendants substantial sums are undercut by the fact that "Plaintiffs utilized Defendants' Services between February 2015 and December 2018." *Id.* ¶120. Plaintiffs have not explained why, if the materials "M&O provided to Plaintiffs were largely unusable[,] . . . [and] not the best-in-class materials that Defendants M&O, Petersmarck and Dennis Brown promised, but instead fell far below even the industry standard[,]" Plaintiffs continued to employ Defendants and pay them substantial sums of money for forty-six months. *Id.* ¶ 116. The Court finds it unreasonable to rely on Defendants representations regarding their sophistication in the face of below-industry-standard work.

18

Plaintiff." *Id.* (emphasis in original) (citing *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 529, 551 (D. Md. 1997)).

In their original Complaint, Plaintiffs pleaded that Defendants "actively hid[]" the CoreCap affiliation, ECF No. 1 ¶ 96, "hid[]" M&O's history of discrimination and Defendant Petersmarck's criminal record, *id.* ¶¶ 97, 98, concealed the criminal record from internet search engines, *id.* ¶ 5, and "never disclosed" that Petersmarck was unlicensed in Michigan or Maryland, *id.* ¶ 51. The Court, however, dismissed any fraud claim based on nondisclosure because "Plaintiffs provid[ed] no legal authority for their conclusory allegation that Defendants owed Plaintiffs a duty to disclose material facts about its business operations, affiliations, background, and personnel[.]" ECF No. 36 at 25 (internal quotation marks omitted). Additionally, the Court dismissed any fraudulent concealment action because (1) "the Complaint fail[ed] to plead any non-conclusory allegations as to how Defendants actively concealed facts from Plaintiffs[,]" *id.*; (2) the Complaint "lack[ed] any allegations suggesting that these facts were material[,]" *id.*; and (3) "the Complaint lack[ed] any allegations as to the harm suffered by Plaintiffs as a result of Defendants' concealment," *id.* at 28. Again, Plaintiffs' proposed Amended Complaint corrects some of these deficiencies, but not all. Plaintiffs have adequately pleaded neither a duty to disclose nor fraudulent concealment.

In their Amended Complaint, Plaintiffs allege that Defendants:

- "actively conceal[ed] material information that would have exposed their misrepresentations[,]" ECF No. 38-2 ¶ 4;

- "concealed material information from [Plaintiff] Winkfield in order to deceive [Plaintiff] Winkfield into believing that M&O and the Defendants had the capability of providing best-in-class Services[,]" *id.* ¶ 20;

- concealed that "Defendant Petersmarck had been convicted of gun and drug felonies, which disqualified him from obtaining a license to sell insurance without a waiver from the State Insurance Commissioner[,]" *id.* ¶ 104; *see also id.* ¶¶ 135–36, 155–56;

- took "active steps to minimize any sort of bad or embarrassing public information from internet searches of the company[,]" *id.* ¶ 122;

- "buried the skeletons in its closet because it knew that 'top producers' like Plaintiffs would not hire M&O if Plaintiffs knew M&O and its affiliates' seedy past[,]" *id.* ¶ 123;

- concealed that "Dennis Brown and his companies had been sued for discrimination and for theft of client funds[,]" *id.* ¶ 124;

- "actively hid . . . that they are affiliated with CoreCap, co-owned and operated by Dennis Brown and others at M&O," *id.* ¶ 137; *see also id.* ¶ 157;

- concealed that "a financial advisor with Dennis Brown's CoreCap entity, an affiliate of M&O, was arrested and charged with embezzlement for stealing nearly a half million dollars from CoreCap clients" and that "CoreCap tried to lowball the victims, . . . offer[ing] impacted clients pennies on the dollar for their losses[,]" *id.* ¶¶ 125–26; *see also id.* ¶ 157; and

- concealed that "M&O was the subject of an adverse finding by the United States Equal Employment Opportunity Commission ('EEOC') that reasonable cause existed to find that M&O had engaged in discrimination" and that Defendants had responded to the discrimination with retaliation, *id.* ¶¶ 129–30; *see also id.* ¶¶ 138, 154, 158

These allegations are not sufficient to support a nondisclosure claim. First, Plaintiffs

again fail to provide any legal authority for their conclusory allegations that Defendants' had a

duty to disclose. *See id.* ¶ 155 (stating, without citing legal authority, that Defendants had a duty

to disclose Defendant Petersmarck's criminal background); *id.* ¶ 156 (same); *id.* ¶ 157 (stating,

without citing legal authority, that Defendants had a duty to disclose their affiliation with

CoreCap and CoreCap's theft of client funds); *id.* ¶ 158 (stating, without citing legal authority,

that Defendants had a duty to disclose their "history of discrimination and retaliation against ex-

employees"). Second, Plaintiffs have not alleged facts sufficient for the Court to infer a duty to

disclose. "A duty to disclose arises in certain relationships such as a confidential or fiduciary

relationship." *Hogan v. Md. State Dental Ass'n*, 843 A.2d 902, 908 (Md. Ct. Spec. App. 2004).

Plaintiffs have not alleged facts demonstrating that a confidential or fiduciary relationship

existed between Plaintiffs and Defendants such as would give rise to a duty to disclose. Finally,

Plaintiffs fail to allege facts that would support a nondisclosure claim despite the absence of a

duty to disclose. Absent a duty to disclose, Maryland courts have recognized that "[o]ne who

conceals facts that materially qualify affirmative representations may be liable for fraud." *Id.*

(quoting *Lubore v. RPM Associates, Inc.*, 674 A.2d 547, 556 (Md. Ct. Spec. App. 1996)).

Plaintiffs allegations are not sufficient to bring the proposed Amended Complaint within this

category because, as discussed above, Plaintiffs do not adequately allege specific affirmative

misrepresentations, but allege that Defendants engaged in non-actionable puffery by promoting a

belief that they were sophisticated and capable of providing best-in-class services. *See supra*

§ III.A.1.a.

Plaintiffs' allegations also do not support a fraudulent concealment claim. "A cause of

action for fraudulent concealment requires the plaintiff to establish 'that the defendant took

affirmative action to conceal the [relevant fact] and that the plaintiff could not have discovered

the [relevant fact] despite the exercise of reasonable diligence." *Mixter v. M.E. Burton, LLC*, No.

1744, 2015 WL 6108044, at *17 (Md. Ct. Spec. App. Sept. 15, 2015) (alterations in original).

Here, Defendant Petersmarck's criminal convictions, the employment lawsuit against M&O,

M&O's alleged retaliation as a result of the employment lawsuit, and CoreCap's embezzlement

scandal are matters of public record, *see, e.g.*, ECF No. 38-2 ¶ 129 (citing a public court

document from a federal case in the Eastern District of Michigan to support its allegations

regarding M&O's employment discrimination and retaliation); *id.* ¶¶ 125–26 (citing a news

article for its allegations regarding CoreCap's embezzlement), and the Court agrees with

Defendants that "Plaintiff could have found [this information] easily with diligence that extended

beyond a quick Google search." ECF No. 46 at 15. Additionally, it seems unlikely that Plaintiffs

did not know of Defendants' association with CoreCap considering Plaintiff Winkfield worked

with CoreCap as an advisor. ECF No. 38-2 ¶ 86 ("Notably, CoreCap terminated Mr. Winkfield's CoreCap appointment just days before the Ripoff Post was uploaded, demonstrating the coordination between Dennis Brown and Mr. Petersmarck").

Because Plaintiffs have not sufficiently pleaded a duty to disclose nor fraudulent concealment,[6] Plaintiffs' allegations relating to a concealment-based fraud claim cannot survive a motion to dismiss. The Court thus finds Plaintiffs' proposed Amended Complaint futile as it relates to Count II (fraudulent concealment/deceit) and denies Plaintiffs' Motion for Leave to Amend Complaint as to Count II.

### 2.      Defamation Claims (Counts V, VI and VIII)

The Court will next discuss Plaintiffs' defamation claims, followed by Plaintiffs' false light claim, *see infra* § III.A.3, because the viability of one of Plaintiffs' tortious interference claims (Counts IV), discussed below, *see infra* § III.A.5, relies in part on the sufficiency of these tort claims.

In order to plead, under Maryland law, a defamation claim sufficient to withstand a motion to dismiss, a plaintiff must allege facts establishing four elements: "(1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm." *Piscatelli v. Van Smith*, 35 A.3d 1140, 1147 (Md. 2012) (internal quotation marks omitted) (quoting *Indep. Newspapers, Inc. v. Brodie*, 966 A.2d 432, 448 (Md. 2009)). Moreover,

---

[6] Plaintiffs also fail to plead fraudulent concealment because they do not adequately allege harm to Plaintiffs as a result of the concealment. The main thrust of Plaintiffs' fraudulent concealment claim is that Plaintiffs would not have hired Defendants had Plaintiffs known the allegedly concealed information. *See, e.g.*, *id.* ¶¶ 124 ("Plaintiffs would not have hired Defendants if they had known that Dennis Brown and his companies had been sued for discrimination and for theft of client funds"). However, the employment lawsuit and the embezzlement scandal both happened long after Plaintiffs had hired M&O. *See* ECF No. 1-5 (article dated September 2017 reporting on the embezzlement scandal); ECF No. 1-6 (same); ECF No. 1-7 ("The EEOC issued a Notice of Right to Sue [regarding the employment discrimination] . . . on January 3, 2016"). Thus, Defendants could not have disclosed those incidents before Plaintiffs' hired them and the failure to disclose did not impact hiring.

as with any claim, Plaintiffs must adequately allege personal jurisdiction over the defendant in question as to the defamation claim in question.

Plaintiffs attempt to state defamation claims (Defamation, Defamation *Per Se*, and Slander[7]) based on three different allegedly defamatory communications: (1) "a false demand letter to Plaintiffs' former business partners" sent by Defendant Ryan Brown (the "Brown Letter"), ECF No. 38-2 ¶¶ 6, 43; (2) "a defamatory 'warning' to Plaintiffs' actual and potential clients to 'BEWARE!' of Plaintiffs due to a false claim of attempted fraud" posted by Defendant Petersmarck on the Ripoff Report website (the "Ripoff Post"), *id.* ¶¶ 4, 43, 53; and (3) an email written by Plaintiffs' competitor, but facilitated by Plaintiffs, containing "false and defamatory misrepresentations to Plaintiffs' clients that they were being overcharged by Plaintiffs, and should switch to a Defendant-affiliated advisor" (the "Klauenberg Blast E-Mail"), *id.* ¶¶ 4, 43. The Court discusses each of these allegedly defamatory communications separately below.

### a.    The Brown Letter

In their original Complaint Plaintiffs attempted to state a defamation claim as to the Brown Letter. The Court, however, dismissed this defamation claim because: (1) "the Complaint only contain[ed] a conclusory allegation that the statement was 'intentional, willful, and/or negligent and calculated to cause damage to Plaintiffs' lawful business'" and thus "fail[ed] to plausibly allege that Defendants are legally at fault for the [Brown Letter,]" ECF No. 36 at 32; and (2) Plaintiffs failed to establish that this Court has specific personal jurisdiction over Defendants with respect to defamation claims based on the Brown Letter because, "regardless of any business Defendants may have solicited or conducted in Maryland, claims based on the

---

[7] Slander is simply a type of defamation, *see Publish Am., LLP v. Stern*, 84 A.3d 237, 247 n.16 (Md. Ct. Spec. App. 2014), so its elements are the same as a claim for defamation, *see Henderson v. Claire's Stores, Inc.*, 607 F. Supp. 2d 725, 730 (D. Md. 2009).

[Brown Letter] do not 'arise out of' these contacts because the Letter[] [was] sent from M&O's office in Michigan to the recipients in . . . Virginia, . . . and there is no specific allegation that Plaintiffs felt any harmful effects . . . in Maryland," *id.* at 17. Plaintiff has corrected the first deficiency, but not the second.

First, drawing all reasonable inferences in Plaintiffs' favor, Plaintiffs have sufficiently pleaded Defendants are legally at fault for the Brown Letter. As discussed above, the third element of a defamation claim under Maryland law is that the defendant is legally at fault in making the defamatory statement. *Piscatelli*, 35 A.3d at 1147. This element "requires a showing that, at a minimum, the party making the false statements acted negligently." *Doe v. Johns Hopkins Health Sys. Corp.*, 274 F. Supp. 3d 355, 366 (D. Md. 2017) (citing *Hearst Corp. v. Hughes*, 466 A.2d 486, 490–92 (Md. 1983)). Actual malice, or a higher degree of fault, requires a showing that the defendant made the defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *Batson v. Shiflett*, 602 A.2d 1191, 1213 (Md. 1992) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)). In their proposed Amended Complaint, Plaintiffs plead "[t]he allegations of misappropriation of M&O materials and copyright infringement in the Brown Letter are baseless, and ironic, because [Plaintiff] Winkfield and his partners found M&O's sales materials to be unhelpful" and "[Plaintiff] Winkfield did not even use Defendants' sales materials when he was working with M&O, and *Defendants knew that when they sent the letters*." ECF No. 38-2 ¶ 170 (emphasis added). Thus, the Court can reasonably infer that Defendants knew that the statements they made about Plaintiff Winkfield misusing copyrighted material were false or, at a minimum, they made the statements "with reckless disregard of whether [they were] false or not." *Batson*, 602 A.2d at 1213.

24

However, as to personal jurisdiction, Plaintiffs' attempts to correct the deficiencies identified by the Court in its previous Order fail. Plaintiffs try to plead specific jurisdiction in their proposed Amended Complaint by alleging that the Brown Letter "arises out of Defendants' contacts with Maryland because the 'copyrighted materials' that Plaintiffs Winkfield and Finley Alexander are accused of misusing are the insurance sales and solicitation slide shows and other written materials that Defendants prepared as part of the Services, for [Plaintiff] Winkfield's use in Maryland[,]" ECF No. 38-2 ¶ 45, and alleging that "[t]he materials are specifically designed to comply with Maryland law[,]" *id.* ¶ 46. These allegations, however, are insufficient to establish specific personal jurisdiction.

In cases such as this, where an out-of-state defendant has acted outside of the forum in a manner that injures someone residing in the forum, the Supreme Court has held that "a court may exercise specific personal jurisdiction over a nonresident defendant . . . when the defendant has intentionally directed his tortious conduct toward the forum state, knowing that the conduct would cause harm to a forum resident." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, at 397–98 (4th Cir. 2003). This test, known as the "effects test" of specific jurisdiction typically requires a plaintiff to establish that:

> (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity.

*Id.* at 398 n.7.

In the instant case, assuming *arguendo* Plaintiff has sufficiently established the first two elements,[8] Plaintiffs have not established the third element. While the Brown Letter discusses

---

[8] There is some question as to whether Plaintiff has established the second element. Plaintiff alleges that the Brown Letter "exacerbated the difficulties that Plaintiffs experienced during the breakup of OWRS, as they were designed to do. Plaintiffs suffered damages because the heightened tensions caused by the Brown Letter fostered distrust

items related to Maryland—*i.e.* the copyrighted material—the copyrighted material did not create the defamation cause of action. Rather, the defamation claim arose from the allegedly defamatory statements contained in the letter, and the letter was sent by Defendants from Michigan to a recipient in Virginia. *Cf. Malebranche v. Johnson*, No. GJH-15-452, 2015 WL 4396745, at *3 (D. Md. July 16, 2015) ("[Plaintiff's] action is for defamation, an action that arose from [the plaintiff's] former spouse's letter, not from their former marriage. . . . Thus, while [the defendant's] allegedly defamatory letter may discuss the marriage, the civil action of defamation did not arise from the marriage."). Thus, any defamation claim based on the Brown Letter fails for lack of personal jurisdiction and the proposed Amended Complaint is futile as to those claims. The Court, consequently, denies on this ground Plaintiffs' Motion for Leave to Amend Complaint as to any defamation claims based on the Brown Letter,

### b.    The Ripoff Post

In their original Complaint, Plaintiffs also attempted to state defamation claims based on the Ripoff Post. The Court, however, dismissed these claims because: (1) the Court lacked jurisdiction over a claim based on the Ripoff Post because "the Court [could] make no reasonable inference that M&O, Dennis Brown, Petersmarck, or Ryan Brown had anything to do with the Post, and so it cannot conclude that Defendants' contacts with Maryland form the basis for the Post[,]" ECF No. 36 at 18; and (2) the Complaint fails to state a claim because the Complaint "lack[ed] any specific factual allegations that any of the Defendants were responsible for the Post[,]" *id.* at 32. Plaintiffs have now corrected these deficiencies. Thus, the Court finds

---

among the partners, and unnecessarily required extra resources to be devoted to the breakup rather than to sales, and based on prior metrics of Plaintiffs' business led to lost sales." ECF No. 38-2 ¶ 110. For the sake of the instant Motion, the Court will assume that Plaintiff felt the brunt of these harms in Maryland.

that, based on Plaintiffs' allegations regarding the Ripoff Post, Plaintiffs sufficiently allege the four elements of a defamation claim and have pleaded specific personal jurisdiction.

**i.     Defamation Element 1: Defendant Made Defamatory Statements to a Third Person**

As to the first element of a defamation claim under Maryland law, Plaintiffs have plausibly pleaded in their proposed Amended Complaint that all Defendants have some responsibility for making the statements in the Ripoff Post. First, Plaintiffs have plausibly alleged that Defendant Petersmarck created the Ripoff Post. Plaintiffs allege that Defendant Petersmarck created and uploaded the Ripoff Post and support that allegation by explaining that the post included confidential information regarding one of Plaintiff Winkfield's clients that was known only to that client, Plaintiffs, and Defendants.  ECF No. 38-2 ¶¶ 53, 54. Since the client denies any involvement, Plaintiffs argue that it is clear Defendant Petersmarck created and uploaded the Ripoff post. *Id.* Moreover, Plaintiffs claim that Defendant Petersmarck, through counsel, has since admitted he uploaded the post. *Id.* Second, Plaintiffs have also plausibly pleaded that M&O is vicariously liable for Defendant Petersmarck's defamatory statement. Specifically, Plaintiffs have alleged that the defamatory statement was made within the scope of Defendant Petersmarck's employment and M&O ratified the statement. *Lewis v. Forest Pharm., Inc.*, 217 F. Supp. 2d 638, 659 ("An employer is liable for the tortious act of its employees either: (1) if the act was within the scope of employment; or (2) if the employer subsequently ratifies the act[.]" (internal citations omitted)); *see* ECF No. 38-2 ¶¶ 178 ("Defendant Petersmarck created the Ripoff Post within the scope of his employment[.]"), 179 ("Defendant Petersmarck's creation of the Ripoff Post is well within the general nature of his marketing job duties, which includes the handling of confidential client information."), 190 ("Defendant[] M&O . . . ratified Mr. Petersmarck's creation of the Ripoff Post."). Finally, with respect to

27

Defendants Dennis and Ryan Brown, it is a closer question, but the Court, after drawing all reasonable inferences in Plaintiffs favor, finds that Plaintiffs have alleged factual allegations sufficient to find that Defendants Dennis and Ryan Brown both "endorsed" the Ripoff Post and "adopted the words as [their] own." *Lewis*, 217 F. Supp. 2d at 657 ("When Mr. Sheldon endorsed the letter [which was written by Mr. Scholl] with a few modifications, he adopted its words as his own. Thus, when Mr. Scholl published the letter again . . . , Mr. Sheldon published it as well."); *see* ECF No. 38-2 ¶ 56 ("Defendant Petersmarck could not have created the Ripoff Post . . . absent the blessing of the CEO and owner of M&O, Defendant Dennis Brown, or M&O's then-general counsel, Defendant Ryan Brown"); *id.* ¶ 186 (stating that the Ripoff post was "authorized by . . . [M&O's] CEO Dennis Brown and its general counsel Ryan Brown[,]"); *id.* ¶ 190 ("Dennis Brown and Ryan Brown have . . . ratified Mr. Petersmarck's creation of the Ripoff Post"); *id.* ¶ 281 (describing Defendants Dennis and Ryan Brown's roles in relation to the Ripoff Post such that the Court can infer that they had to authorize and adopt the post as their own in order for it to be published).

Also relevant to the first element, Plaintiffs adequately allege that the statements made in the Ripoff Post were defamatory. "For the purposes of the first element [of a defamation claim], a 'defamatory statement' is one that tends to expose a person to 'public scorn, hatred, contempt, or ridicule,' which as a consequence, discourages 'others in the community from having a good opinion of, or associating with, that person.'" *Piscatelli*, 35 A.3d at 1147. "A statement that is defamatory *per se* is one for which the 'words themselves impute the defamatory character,' such that the plaintiff need not plead additional facts demonstrating their defamatory nature." *Doe*, 274 F. Supp. 3d 366 (quoting *Metromedia, Inc. v. Hillman*, 400 A.2d 1117, 1123 (Md. 1979)). The Ripoff Post stated that Plaintiffs had "attempted to defraud" their client. ECF No. 1-

9.[9] "[A] statement which disparages the business reputation of a plaintiff is one of the categories traditionally considered to be defamation *per se*" as is a "[s]tatement[] imputing criminal behavior[.]" *Russel v. Railey*, No. DKC 08-2468, 2012 WL 1190972, at *3 (D. Md. Apr. 9, 2012) (internal quotation marks omitted and citations omitted); *see S. Volkswagen, Inc. v. Centrix Fin., LLC*, 357 F. Supp. 2d 837, 842–43 (D. Md. 2005) (holding that it was defamatory *per se* for the defendant to tell the plaintiff's competitor that the plaintiff was a "fraud and being investigated for fraud crimes with banks and customers"); *Carter v. Aramark Sports & Entm't Servs., Inc.*, 835 A.2d 262, 278 (Md. Ct. Spec. App. 2003) ("[T]he allegation that a person is a thief constitute defamation *per se*."); *Shapiro v. Massengill*, 661 A.2d 202, 218 (Md. Ct. Spec. App. 1995) (noting that the statements that the plaintiff was "evasive, secretive, dishonest, dishonorable, and perhaps even a criminal" were defamatory *per se*). Thus, Plaintiffs adequately allege that the Ripoff Post was defamatory.

Finally, because the Ripoff Post was published on a website, the proposed Amended Complaint "certainly alleges communication to a third party[,]" as required to satisfy the first element of a defamation claim. *Russell*, 2012 WL 1190972, at *3.

### ii.        Defamation Element 2: Statement was False

Plaintiffs also adequately allege the falsity of at least one defamatory statement included within the Ripoff Post. The Ripoff Post was entitled "Finley Alexander Wealth Management Kyle Winkfield Attempted annuity fraud Rockville Maryland" and stated that "Kyle Winkfi[el]d and his firm, then OWRS Firm, now Finley Alexander Wealth Management attempted to defraud" a client. ECF No. 1-9. Throughout the proposed Amended Complaint, Plaintiffs allege

---

[9] The Court may consider the Ripoff Post, which was attached as an exhibit to Plaintiffs' original Complaint, because it was explicitly incorporated into the proposed Amended Complaint by reference and is integral to Plaintiffs' proposed Amended Complaint. *Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 501–02 (D. Md. 2019).

that the statement in the Ripoff Post that Plaintiffs "attempted to defraud" their client was false. ECF No. 38-2 ¶¶ 43, 53, 183, 253. Defendants try and skirt this issue by claiming that the statement is actually that a client had complained that Plaintiffs had tried to defraud her, which Plaintiffs have not denied. *See* ECF No. 46 at 19. However, for present purposes, the Court finds that a trier of fact might reasonably infer that the Ripoff Post could be read the way Plaintiff interprets it. *Cf. Hoai Thanh v. Ngo*, No. PJM-14-448, 2015 WL 2227923, at *6 (D. Md. May 8, 2015).

### iii.      Defamation Element 3: Defendant was Legally at Fault in Making the Statement

As to the third element, Plaintiffs adequately allege that Defendants are legally at fault for making the statements in the Ripoff Post. The third element of a defamation claim "requires a showing that, at a minimum, the party making the false statement acted negligently." *Doe*, 274 F. Supp. 3d at 366 (citing *Hearst Corp. v. Hughes*, 466 A.2d at 490–92). In the context of defamation cases involving private plaintiffs, to adequately show negligence, plaintiffs must allege facts sufficient to show that the defendant "failed to act as 'a reasonable person under like circumstances' in making the false and defamatory statements.'" *Hawk v. Ruby*, No. 03-C-15-005270, 2019 WL 4860760, at *9 (Md. Ct. Spec. App. Oct. 1, 2019) (quoting Restatement (Second) of Torts § 580B, comment g (Am. Law. Inst. 1977)). Whereas, actual malice requires a showing that the defendant made the defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *Batson*, 602 A.2d at 1213 (quoting *New York Times Co.*, 376 U.S. at 279–80). Here, the proposed Amended Complaint adequately alleges actual malice. According to Plaintiffs, Defendants knew the statements contained in the Ripoff Post, including the statement that Plaintiffs attempted to defraud their client, were false. ECF No. 38-2 ¶ 224. Specifically, Defendants M&O, Petersmarck, Dennis Brown, and Ryan

30

Brown knew of the falsity because they "assisted [Plaintiff] Winkfield in addressing the client complaint that is referenced in the Ripoff Post." *Id.*[10]

### iv.   Defamation Element 4: Plaintiff Suffered Harm

Finally, Plaintiffs' proposed Amended Complaint includes allegations of harm sufficient to meet the requirements of the fourth defamation element. "For the fourth element, actual harm must be generally established, but in cases in which the statement was defamatory *per se* and was made with actual malice, harm may be presumed." *Doe*, 274 F. Supp. 3d at 366. Thus, in this case, since the proposed Amended Complaint adequately alleges that the statement was defamation *per se* and was made with actual malice, harm is presumed. *See supra* §§ III.A.2.b.i & III.A.2.b.iii. However, even if harm was not presumed, Plaintiffs allege that at least 135 prospective clients chose not to engage Plaintiffs' financial advisory services as a result of the Ripoff Post and includes a sealed list of those clients. ECF No. 38-2 ¶ 244; *see* ECF No. 38-2 at 138–40. Additionally, Plaintiffs allege that one of Plaintiffs' financial advisors, Mr. Serfas, left Finley Alexander due to the negative impact of the Ripoff Post and thus the Ripoff Post deprived Plaintiffs of the revenue that would have been generated by Mr. Serfas. ECF No. 38-2 ¶¶ 58–60, 244.

### v.   Personal Jurisdiction

In their opposition to Plaintiffs' Motion for Leave to Amend, Defendants chose not to include a detailed argument that this Court lacks personal jurisdiction over Defendants with regard to the defamation claims. Instead, Defendants noted that that they would bring such a challenge if the Court granted Plaintiffs' motion. ECF No. 46 at 27. However, because an

---

[10] Although the Court does not rely on the email exchange attached to Defendants' opposition in reaching its conclusion, it is worthy of note that in that exchange—which took place prior to the Ripoff Post—Plaintiff Winkfield explained to Defendant Petersmarck that the contract in question was a bonus product and that the client "even signed the document that shows the bonus." ECF No. 46-2.

Case 8:19-cv-01312-GJH   Document 49   Filed 03/31/21   Page 32 of 46

amendment is futile if it cannot withstand a motion to dismiss, this Court briefly addresses personal jurisdiction with respect to Plaintiffs' Ripoff Post-related defamation claims against Defendant M&O, Petersmarck, Dennis Brown, and Ryan Brown.

As mentioned above, in the Court's previous Memorandum Opinion granting Defendants' Motion to Dismiss, the Court indicated that it could not find that it had personal jurisdiction over Defendants with regard to the Ripoff Post defamation claims because the Court could not make a "reasonable inference that Defendant M&O, Dennis Brown, Petersmarck, or Ryan Brown had anything to do with the Post, and so it cannot conclude that Defendants' contacts with Maryland form the basis for the Post." ECF No. 36 at 18. This deficiency has been remedied.

First, Plaintiffs sufficiently allege that Defendants were responsible for the Ripoff Post. *See supra* § III.A.2.b.i. Second, Plaintiffs adequately allege that the Ripoff Post arose from Defendants business contacts with the forum state. Plaintiffs allege that the Ripoff Post was created using confidential client information that Defendant Petersmarck obtained through his position as Plaintiffs' "principal contact" at M&O. ECF No. 38-2 ¶¶ 41, 181, 183. Additionally, Plaintiffs allege that Defendants "specifically assisted Mr. Winkfield in addressing the client complaint that is referenced in the Ripoff Post[,]" and the Court can reasonably infer this assistance was provided as part of the Maryland-centric services Defendants provided to Plaintiffs during their business relationship. *id.* ¶¶ 178, 224. Finally, Plaintiffs allege Defendants created and published the Ripoff Post with the intention to harm Plaintiffs' Maryland business, *id.* ¶ 55 ("includes false statements in the Ripoff Post that are specifically designed by Defendants to damage Plaintiffs' Maryland business"), which would benefit Defendants as

32

Plaintiffs' competitor, *id.* ¶¶ 186–87. Thus, for the purposes of this Motion, the Court finds that Plaintiffs allege jurisdictional facts sufficient to avoid futility.

Because Plaintiffs adequately allege all four elements of a defamation claim with respect to their defamations claims based on the Ripoff Post—such that the defamation claims can survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6)—and sufficiently allege personal jurisdiction, the proposed Amended Complaint is not futile as to Plaintiffs' Ripoff Post-related defamation claims.

### c.   The Klauenberg Blast E-Mail

In their proposed Amended Complaint, Plaintiffs allege a new basis for their defamation claims: Plaintiffs allege that Defendants released "confidential information of Plaintiffs' Maryland clients to Plaintiffs' competitor and facilitate[ed] that competitor's false and defamatory misrepresentations to Plaintiffs' clients that they were being overcharged by Plaintiffs, and should switch to a Defendant-affiliated advisor[.]" ECF No. 38-2 ¶¶ 6, 43. Specifically, "CoreCap advisor Mr. Jeff Klauenberg sent a blast email to Plaintiffs' Maryland clients" on August 19, 2019, *id.* ¶ 87, stating that (1) he was "informed by Core Cap Advisors that [those clients'] advisor, Kyle Winkfield, ha[d] left the firm[,]" *id.* ¶ 88 (emphasis omitted); (2) he would like to meet with those clients as soon as possible, *id.* ¶ 89; (3) he charges all of his client "a management fee of 1.25% or less[,]" which is 30% lower than the 1.8% charged by Plaintiffs, *id.* ¶¶ 92; and (4) the fee of 1.8% is "very high and out of line with industry standards[,]" *id.* Plaintiffs' allege that these statements are either indisputably false or misleading and that their misleading nature was the result of Defendants only giving Mr. Klauenberg information on one piece of Plaintiffs' clients' portfolios. *Id.* ¶¶ 93–94, 225. However, these allegations are insufficient to support a defamation claim against Defendants.

As discussed above, in order to plead, under Maryland law, a defamation claim sufficient to withstand a motion to dismiss, a plaintiff must establish: "(1) that the defendant made a defamatory statement to a third person[.]" *Piscatelli*, 35 A.3d at 1147. Plaintiffs have not pleaded factual allegations sufficient to meet this first element. Defendants did not write the Klauenberg Blast E-Mail. Moreover, Plaintiffs have alleged that CoreCap Advisors provided the information used by Mr. Klauenberg, not Defendants. ECF No. 38-2 ¶ 88. Finally, Plaintiffs allege, without support, that Defendants "ratified the misleading Klauenberg Blast E-Mail by improperly releasing the confidential information that Mr. Klauenberg used to create them, and by then taking no action to correct what they knew were Mr. Klauenberg's misleading statements to clients[.]" *id.* ¶ 141, 162, 208, 226, 243, 272. However, Plaintiffs have neither alleged that the information Defendants provided to Mr. Klauenbeg was false nor that Defendants intended him to make misleading statements based on it, *id.* ¶ 84 (describing Defendants intent as wanting "to deprive Plaintiffs of the ongoing revenues generated by these Maryland clients[,]" not to mislead the clients), nor do Plaintiffs allege that Defendants had any duty to correct the misleading statements of Mr. Klauenberg. Therefore, the Court finds that Plaintiffs fail to allege that Defendants are responsible for the Klauenberg Blast E-Mail and that any defamation claim against Defendants based on the Klauenberg Blast E-Mail is thus futile. Consequently, the Court denies Plaintiffs' Motion for Leave to Amend Complaint as to such claims.

### 3.    False Light Claim (Count VII)

Plaintiffs, in both their original Complaint and in their proposed Amended Complaint, attempt to plead a false light invasion of privacy claim. "The elements of a claim of false light invasion of privacy are: (1) publicity in a false light before the public; (2) which a reasonable person would find highly offensive; and (3) that the actor had knowledge of or acted in reckless

disregard of the publicized matter placing plaintiff in a false light." *Hoai Thanh*, 2015 WL 2227923, at *6. The Court dismissed Plaintiffs' original false light claim because: (1) with respect to the Brown Letter, there were no allegations that the letter "went to the public at large" and "no allegations to suggest that the contents would in any way become public knowledge[,]" ECF No. 36 at 33; and (2) with respect to the Ripoff Post, "the Complaint lack[ed] any factual allegations tying it to the individual Defendants or establishing that M&O would be vicariously liable for the Post[,]" *id.* at 34. In their proposed Amended Complaint, Plaintiffs have not corrected the original Complaint's deficiencies with respect to the Brown Letter and make the same errors with respect to false light claims based on the Klauenberg Blast E-Mail. However, Plaintiffs have sufficiently pleaded a false light invasion of privacy claim with respect to the Ripoff Post.

Regarding the Brown Letter and the Klauenberg Blast E-Mail, Plaintiffs have not pleaded factual allegations sufficient to withstand a motion to dismiss as to the first element of a false light invasion of privacy claim.[11] "Under the first prong of a false light claim, a plaintiff must show that the offending statements have been communicated to the public at large or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Holt v. Camus*, 128 F. Supp. 2d 812, 817 (D. Md. 1999). The Brown Letter was only sent to one person, Jeremy D. Shipp, which is far from being communicated to the public at large or substantially certain to become public knowledge. ECF No. 1-10 at 2. The Klauenberg Blast E-Mail was sent to more people—*i.e.*, Plaintiffs' former Maryland clients—but again Plaintiffs' Maryland clients are not the public at large, nor does the Court know how many people such a group includes, much less that the offending statements found in the email were

---

[11] For the same reasons discussed above, *see supra* § III.A.2.a, the Court also lacks specific jurisdiction over Plaintiffs' claims based on the Brown Letter.

substantially certain to become public knowledge. *See* ECF No. 38-2 ¶ 87. Thus, to the extent

Plaintiffs' false light claims are based on the Brown Letter or the Klauenberg Blast E-Mail,

Plaintiffs' proposed Amended Complaint is futile and the Court denies Plaintiffs' Motion for

Leave to Amend Complaint as to those claims.[12]

Regarding the Ripoff Post, Plaintiffs have adequately pleaded a false light invasion of

privacy claim. First, for the same reasons discussed in the defamation section above, Plaintiffs

have adequately alleged that Defendants are responsible for creating and publishing the Ripoff

Post and that the Court has specific personal jurisdiction over Defendants with respect to the

claims arising out of the post. *See supra* §§ III.A.2.b.i, III.A.2.B.v. Second, as to the first element

of a false light claim, the Ripoff Post was published on a public website, *see* ECF No. 38-2 ¶ 53,

and thus was communicated to the public at large. *Holt*, 128 F. Supp. 2d at 817. Additionally, as

discussed above, Plaintiffs have sufficiently alleged that a statement within the Ripoff Post was

false. *See supra* § III.A.2.b.ii. Third, as to the second element of a false light claim, it seems

uncontroversial that Defendants' statement that Plaintiffs "attempted to defraud" a client would

be highly offensive to a reasonable person. ECF No. 1-9; *see Hoai Thanh*, 2015 WL 2227923, at

*6. Fourth, and finally, Plaintiffs have sufficiently alleged that Defendants "had knowledge of or

acted in reckless disregard of the publicized matter placing plaintiff in a false light." *Hoai Thanh*,

2015 WL 2227923, at *6. According to Plaintiffs, Defendants knew the statements contained in

the Ripoff Post, including the statement that Plaintiffs attempted to defraud their client, were

false. ECF No. 38-2 ¶ 224. Specifically, Defendants M&O, Petersmarck, Dennis Brown, and

---

[12] This conclusion is further supported by the fact that Plaintiffs defamation claims based on the Brown Letter and the Klauenberg Blast E-Mail fail. *See supra* §§ III.2.a & c. "[T]he Fourth Circuit, interpreting Maryland law, has refused to allow a claim for false light/invasion of privacy to go forward where the claim fails to meet the standards for defamation." *Holt*, 128 F. Supp. 2d at 816 (citing *AIDS Counseling & Testing Ctrs. v. Grp. W Television, Inc.*, 903 F.2d 1000, 1004 n.1 (4th Cir. 1990)).

Ryan Brown knew of the falsity because they "assisted [Plaintiff] Winkfield in addressing the client complaint that is referenced in the Ripoff Post." *Id.* Thus, Plaintiffs have sufficiently alleged a false light claim against Defendants based on the Ripoff Post,[13] and Plaintiffs' proposed Amended Complaint is not futile as to that claim.

### 4.   Tortious Interference with Contract (Count III)

Plaintiffs allege in their proposed Amended Complaint, as they did in their original Complaint, that Defendants wrongfully interfered with Plaintiffs' contracts. To plead a claim for wrongful interference with a contract, a plaintiff must demonstrate:

> (1) [t]he existence of a contract or a legally protected interest between the plaintiff and a third party; (2) the defendants' knowledge of the contract; and (3) the defendant's intentional inducement of the third party to breach or otherwise render impossible the performance of the contract; (4) without justification on the part of the defendant; (5) the subsequent breach by the third party; and (6) damages to the plaintiff resulting therefrom.

*Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 353–54 (4th Cir. 2013) (internal quotation marks omitted) (quoting *Blondell v. Littlepage*, 968 A.2d 678, 696 (Md. Ct. Spec. App. 2009)). The Court dismissed Plaintiffs' original tortious inference with contract claims because the Complaint did not include any non-conclusory allegations "that Defendants intended to induce

---

[13] Defendants argue that "the proposed complaint fails to state a claim for false light because it does not concern a private matter[;]" however, the authority Defendants cite for the requirement that the matter must be "private" appears to refer to a separate type of claim under Maryland law. ECF No. 46 at 27. Defendants cite *Klipa v. Bd. of Educ. of Anne Arundel Cty.*, 460 A.2d 601 (Md. Ct. Spec. App. 1983) for the requirement that the subject of the offending statement must be "not of legitimate concern to the public[.]" ECF No. 46 at 27. This quote, however, comes from the Restatement (Second) of Torts, § 652D ("Publicity Given to Private Life"). *See Klipa*, 460 A.2d at 607. Under Maryland law, "Publicity Given to Private Life" as described in Restatement (Second) of Torts § 652D is a separate form of invasion of privacy from false light as described in Restatement (Second) of Torts § 652E, which is the type of claim at issue here. *See Gladhill v. Chevy Chase Bank, F.S.B.*, No. 905 Sept. Term 2000, 2001 WL 894267, *18 (Md. Ct. Spec. App. Aug. 1, 2001) ("Placing a person in a false light is a form of invasion of privacy. Yet, appellant's argument is devoid of any discussion of 'False Light' or of Restatement § 652E. Instead, appellant has discussed Restatement § 652D, titled 'Publicity Given to Private Life.'" (internal citations omitted)); *Furman v. Sheppard*, 744 A.2d 583, at 587–88 (Md. Ct. Spec. App. 2000) (discussing a "false light" claim and a "publicizing private facts" claim separately and applying different standards; *see also* Restatement (Second) of Torts § 652E, comment a ("The form of invasion of privacy covered by the rule stated in this Section does not depend upon making public any facts concerning the private life of the individual.").

any of Plaintiffs' clients to breach a contract or that any of Plaintiffs' clients have actually breached a contract with Plaintiffs." ECF No. 36 at 29. Plaintiffs proposed Amended Complaint still suffers from the same deficiencies.

Plaintiffs' proposed Amended Complaint is still devoid of any allegations of a breach by one of Plaintiffs' existing clients as a result of Defendants' actions. The closest Plaintiffs come is alleging that "Plaintiffs lost valuable time building their business assuaging [clients'] unfounded fears arising from the Ripoff Post" and that the "Ripoff Post diminished the trust between Plaintiffs and their existing clients." ECF No. 38-2 ¶¶ 176–77. These allegations are insufficient to support a tortious interference with contract claim, however, because there is no alleged breach. *See Painter's Mill Grille, LLC*, 716 F.3d at 354 (requiring plaintiff to establish a breach by a third-party).

However, Plaintiffs, in their proposed Amended Complaint, do allege a breach of contract by one of Plaintiffs' financial advisors, Mr. Serfas, who "left Finley Alexander due to the Ripoff Post[.]" ECF No. 38-2 ¶ 174. Yet, this alleged breach cannot support a tortious interference with contract claim because Plaintiffs have not set forth even conclusory allegations that Defendants intentionally induced Mr. Serfas to breach his employment contract or made it impossible for Mr. Serfas to continue working for Plaintiffs. *See Painter's Mill Grille, LLC*, 716 F.3d at 354 (requiring plaintiff to establish "the defendant's intentional inducement of the third party to breach or otherwise render impossible the performance of the contract"). Plaintiffs only allege that "Defendants having knowingly and intentionally sought to interfere with Plaintiffs' contracts with their Maryland financial advisory clients[,]" not with Plaintiffs' contracts with their employees. *See* ECF No. 38-2 ¶ 169. Thus, Plaintiffs' tortious interference with contract claim cannot withstand a motion to dismiss and Plaintiffs' amendment is futile with respect to

this claim. The Court denies Plaintiffs' Motion for Leave to Amend Complaint with respect to Count III.

### 5.      Tortious Interference with Prospective Business Advantage

In their original Complaint, Plaintiffs claimed that Defendants interfered with Plaintiffs' future business relationships by posting the Ripoff Post. ECF No. 1 ¶¶ 115–22. Plaintiffs have expanded this claim in their proposed Amended Complaint, alleging that Defendants "have knowingly and intentionally sought to interfere with Plaintiffs' prospective business advantages and opportunities for their Maryland financial advisory by sending the false and defamatory Brown Letter, posting the Ripoff Post, inducing the Klauenberg Blast E-Mail, and then filing the Michigan Suit." ECF No 38-2 ¶ 207.

To state a claim for tortious interference with prospective business advantage, the plaintiff must plead "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting." *Audio Visual Assocs., Inc. v. Sharp Elecs. Corp.*, 210 F.3d 254, 261 (4th Cir. 2000) (internal quotation marks omitted) (quoting *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 269 (Md. 1994)). The plaintiff "must identify a possible future relationship [or transaction] which is likely to occur, absent the interference with specificity[.]" *Baron Fin. Corp. v. Natanzon*, 471 F. Supp. 2d 535, 546 (D. Md. 2006). The Court dismissed Plaintiff's tortious interference with business advantage claim, as pleaded in the original Complaint, because the Complaint failed to allege in a non-conclusory fashion this possible future relationship or transaction. ECF No. 36 at 30.

In their proposed Amended Complaint, Plaintiffs base their tortious interference with prospective business advantage claim on four allegedly wrongful acts by Defendants: (1) the Brown Letter; (2) the Klauenberg Blast E-Mail; (3) a Michigan lawsuit to enforce Ms. Spencer-Tiemann's non-compete (the "Michigan Lawsuit"); and (4) the Ripoff Post. ECF No 38-2 ¶ 207. Plaintiffs' tortious interference claims based on the Brown Letter, the Klauenberg Blast E-Mail, and the Michigan Lawsuit fail, but Plaintiffs' tortious interference claim based on the Ripoff Post survives. The Court discusses each allegedly wrongful act below.

### a.      The Brown Letter

Plaintiff has not alleged a possible future relationship or transaction that would have occurred absent the Brown Letter; rather Plaintiffs only allege the Brown Letter caused "heightened tensions[,] . . . fostered distrust among the partners, and unnecessarily required extra resources to be devoted to the breakup rather than to sales, and based on prior metrics of Plaintiffs' business led to lost sales." ECF No. 38-2 ¶ 110. A vague allegation of "lost sales" does not meet the requirement that Plaintiffs "identify a possible future relationship [or transaction] which is likely to occur, absent [Defendants'] interference, *with specificity*." *Baron Fin. Corp.*, 471 F. Supp. 2d at 546 (emphasis added). Thus, the Court finds Plaintiff's proposed Amended Complaint futile with respect Plaintiffs' Brown Letter-related tortious interference claims and denies Plaintiffs' Motion for Leave to Amend Complaint as to such claims.

### b.      The Klauenberg Blast E-Mail

Plaintiffs also do not allege with sufficient specificity a possible future relationship or transaction that would have occurred absent the Klauenberg Blast E-Mail. While Plaintiffs do allege that Defendants provided Mr. Klauenberg with confidential information for the purpose of "destroy[ing] Plaintiffs professionally[,]" ECF No. 38-2 ¶ 98, Plaintiffs' proposed Amended

Complaint does not contain any non-conclusory allegation regarding possible future relationships or transaction that would have occurred absent the Klauenberg Blast E-Mail. Rather, Plaintiffs set forth conclusory allegations that they lost the sales and opportunities related to at least 135 potential clients "due to the harm to Plaintiffs' reputation arising from the . . . Klauenberg Blast E-Mail[,]" but Plaintiffs fail to allege how these clients would even have seen the Klauenberg Blast E-Mail, which went only to Plaintiffs' existing clients. ECF No. 38-2 ¶ 144. Moreover, as to those existing clients, Plaintiffs only allege that they "began to contact Plaintiffs with questions and confusion arising from the Klauenberg Blast E-Mail[,]" not that any of these clients stopped doing business with Plaintiffs or told others about the email, potentially affecting a future relationship or transaction. ECF No. 38-2 ¶ 91. Thus, Plaintiffs' have failed to state a tortious interference with prospective business advantage claim based on the Klauenberg Blast E-Mail, and the Court denies Plaintiffs' Motion for Leave to Amend Complaint with respect to such a claim as futile.

c.  **The Michigan Lawsuit**

Plaintiffs have not alleged that the lawsuit against Ms. Spencer-Tiemann was brought with an unlawful purpose as required to state a claim for tortious interference with prospective business advantage. "Tortious or deliberate intent to harm a plaintiff's business relationship is not alone sufficient to support an intentional interference claim. There also must be proof that the defendant's conduct in interfering with contract or business relations was accomplished through improper means." *Lyon v. Campbell*, 707 A.2d 850, 860 (Md. Ct. Spec. App. 1998). Thus, "to recover for tortious interference with business or contractual relationships, the defendant's conduct must be 'independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships.'" *Id.* (quoting *Alexander & Alexander, Inc.*, 650 A.2d at 657).

41

Here, Plaintiffs allege that Defendant delayed filing the—ultimately successful, ECF No. 38-2 ¶ 74—Michigan Lawsuit against Ms. Spencer-Tiemman in order to advance "their business purposes, by preventing Mr. Winkfield from working with his trusted public relations advisor, Ms. Spencer-Tiemann, *a[t] precisely the time* that Mr. Winkfield was grappling with the public relations disasters[.]" *Id.* ¶ 195; *see also id.* ¶¶ 70–72 (describing the delay). But, "[a] deliberate delay in exercising a lawful right does not make the act of exercising the right a wrongful act." *Lyon*, 707 A.2d at 862. Thus, Plaintiffs' tortious interference with prospective business advantage claim, to the extent it is based on the Michigan lawsuit, fails.[14] The Court, therefore, denies Plaintiffs' Motion for Leave to Amend Complaint as to such a claim as futile.

### d.      The Ripoff Post

Finally, as to the Ripoff Post, Plaintiffs have set forth a viable claim for tortious interference with prospective business advantage. As a preliminary matter, as discussed with respect to the Ripoff Post-related defamation claims, Plaintiffs have adequately alleged, under Fed. R. Civ. P. 12(b)(6), that all Defendants were responsible for the Ripoff Post. *See supra* § III.A.2.b.i. Then, with respect to the elements of a tortious interference with prospective business advantage claim, Plaintiff has adequately alleged an intentional and willful act, which was calculated to cause damage to Plaintiffs in their lawful business, that was done with the unlawful purpose to cause damage or loss, without right or justifiable cause. *See Audio Visual Assocs., Inc.*, 210 F.3d at 261. Specifically, Plaintiffs allege that Defendants knew both that "'reputation is everything' for financial advisories[,]'" ECF No. 38-2 ¶ 173, and that the statements contained in the Ripoff Post, including the statement that Plaintiffs attempted to defraud a client, were false, *id.* ¶ 224.  Thus, Defendants were intentionally "trying to take 'everything' from

---

[14] This claim also fails because Plaintiffs have not specified any future relationship or transaction that would have occurred absent the lawsuit. *Baron Fin. Corp.*, 471 F. Supp. 2d at 546.

Plaintiffs—their reputation, and by extension their business—through [the defamatory statements posted in] the Ripoff Post." *Id.* ¶ 173. Finally, Plaintiffs have alleged that actual damage and loss resulted from the Ripoff Post. Plaintiffs allege that at least 135 prospective clients chose not to engage Plaintiffs' financial advisory services as a result of the Ripoff Post. *See, e.g.*, ECF No. 38-2 ¶ 9 ("Many of the canceling potential clients pointed to the Ripoff Post as *the* reason, or a material reason, for their decision not to continue the sign-on process."); *id.* ¶ 214 ("In the past year since the Ripoff Post was uploaded to the web, at least one hundred and fifteen (115) individuals or couples attended seminars with Mr. Winkfield, scheduled initial consultations, and then later canceled the meetings and refused to do business with him or even to return his calls. . . . Many, if not most, have specifically informed Mr. Winkfield that the Ripoff Post was *the* factor, or at least a material fact, in their decision not to retain Mr. Winfield."); *id.* ¶ 215 ("At least another twenty (20) individuals or couples made and kept meetings with Mr. Winkfield, but ultimately failed to retain Plaintiffs' services, with many also specifically citing the Ripoff Post as a major factor in their decision-making process."); *see also id.* at 138–40. Thus, Plaintiffs have alleged a tortious interference with prospective business advantage claim based on the Ripoff Post sufficient to survive a motion to dismiss, and Plaintiffs' proposed amendment is not futile as to that claim.

### 6.    Conspiracy (Count IX)

Plaintiffs add a civil conspiracy claim in their proposed Amended Complaint. Under Maryland law, to bring a claim for civil conspiracy, a plaintiff must allege the following: "(1) a confederation of two or more persons by agreement or understanding, (2) some unlawful tortious act done in furtherance of the conspiracy, or use of unlawful or tortious means to accomplish an act not in itself illegal, and (3) actual legal damage resulting to the plaintiff." *Hanson-Metayer v.*

*Rach*, Nos. 737, 1657, Sept. Term, 2017, 2018 WL 5045773, at *15 (Md. Ct. Spec. App. Oct. 17, 2018) (citing *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 154 (2007)). Plaintiffs have clearly met the second and third elements based on their allegations regarding their Ripoff Post-related defamation, false light, and tortious interference with prospective business advantage claims and the damages resulting therefrom. *See supra* §§ III.A.2.b, III.A.3, III.A.5.d. Additionally, the Court finds that Plaintiffs have adequately alleged the first element of a civil conspiracy claim under the motion to dismiss standard.

> The Court of Appeals of Maryland has held that a civil conspiracy:

> may be established by inference from the nature of the acts complained of, the individual and collective interest of the alleged conspirators, the situation and relation of the parties at the time of the commission of the acts, the motives which produced them, and all the surrounding circumstances preceding and attending the culmination of the common design.

*Windesheim v. Larocca*, 116 A.3d 954, 975 (Md. 2015). Accordingly, the Court finds that Plaintiffs' have adequately alleged a confederation between the Defendants by agreement or understanding based on the factual allegations found in the proposed Amended Complaint. Specifically, Plaintiffs have alleged motive plus individual and collective interest on the part of all Defendants, *see* ECF No. 38-2 ¶¶ 39–42 (outlining how all Defendants lost either substantial revenue or compensation as a consequence of the breakup between M&O and Plaintiffs, leading to Defendants "entering into a conspiracy agreement and understanding to destroy Plaintiffs' Maryland-based business"), a relationship among the parties with respect to each of Defendants' "four attacks on Plaintiffs' reputation[,]" *see id.* ¶ 43 ("(1) Defendant Ryan Brown sent a defamatory letter to Mr. Winkfield's former OWRS partners at a critically damaging juncture, with the blessing of co-conspirator M&O CEO Dennis Brown and based on factual information provided by Defendant Petersmarck, Plaintiffs' M&O relationship manager; (2) Defendant Petersmarck posted the Ripoff Post with false fraud allegations based on confidential client

information under the control of CEO Dennis Brown, and which information as handled under protocols and procedures for which Ryan Brown was responsible; (3) Defendants released confidential client information to Plaintiffs' Maryland competitor, and M&O client, Mr. Jeff Klauenberg to facilitate Mr. Klauenberg's attempts to win Plaintiffs' Maryland clients back for M&O through false and defamatory misstatements misrepresenting the confidential information the Defendant conspirators provided to him; and (4) by depriving Plaintiffs' of their trusted public relations advisor in the middle of these public conspirator-created messes[.]"), and the circumstances preceding and leading to the common design, *see id.* ¶ 5 ("after Plaintiffs terminated the parties' relationship, Defendants retaliated"). Thus, the Court finds Plaintiffs have adequately stated a claim for civil conspiracy and the Amended Complaint is not futile with respect to Count IX.

### B.    Bad Faith

Defendants also argue that the Court should deny Plaintiffs' Motion for Leave to Amend Complaint because Plaintiffs are pursuing "bad faith tactics in this litigation[.]" ECF No. 46 at 2. This argument is unpersuasive.

Whatever inconsistencies Plaintiffs' proposed Amended Complaint contains,[15] they do not rise to the level of bad faith. "[I]n general, courts have concluded that bad faith is a subjective inquiry that requires proof that the moving party acted with intent to deceive, harass, mislead, delay, or disrupt." *Brown v. Pfeiffer*, No. , 2020 WL 1164594, at *3 (D. Minn. Mar. 11, 2020).  Defendants' unsupported assertion that Plaintiffs "intend to vex and harass Defendants with this litigation" does not make it so. *See* ECF No. 46 at 28. Nor does Defendants' citation to *Adbul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278 (4th Cir. 2018), strengthen their

---

[15] In their opposition, Defendants identify a single inconsistency in Plaintiffs' 63-page proposed Amended Complaint.

argument.[16] Instead, the Court finds that Plaintiffs made substantial revisions to their original complaint in an attempt to address the numerous deficiencies the Court previously identified and have successfully done so at least in respect to Plaintiffs' Ripoff Post-related defamation, false light, and tortious interference with prospective business advantage claims. *See supra* § III.A.

Although Plaintiffs' modifications are insufficient to move each and every claim past the motion to dismiss stage of this litigation, the Court finds Plaintiffs' proposed Amended Complaint is neither entirely futile nor in bad faith. Thus, the Court grants, in part, and, denies, in part, Plaintiffs' Motion for Leave to Amend Complaint.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Leave to Amend Complaint, ECF No. 38, is granted, in part, and denied, in part. A separate Order shall issue.

Date: <u>March   31, 2021</u>                                    <u>        /s/                             </u>
                                                                        GEORGE J. HAZEL
                                                                        United States District Judge

---

[16] *Adbul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278 (4th Cir. 2018), is distinguishable from the instant case. Specifically, the line on which Defendants rely—"the misleading and inconsistent assertions . . . also indicate bad faith"—does not reference allegations in a complaint but rather assertions made by counsel during oral arguments. *Id.* at 293 n.7. Moreover, the misleading and inconsistent assertions in *Adbul-Mumit* were not about the factual matter underlying the complaint but about the procedural history surrounding the motion to amend itself. *Id.*