**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| | * | |
| **FINLEY ALEXANDER WEALTH** | | |
| **MANAGEMENT, LLC,** *et al.* | * | |
| | | |
| **Plaintiffs,** | * | |
| **v.** | | **Case No.: GJH-19-1312** |
| | * | |
| **M & O MARKETING, INC.,** *et al.*, | | |
| | * | |
| **Defendants.** | | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**MEMORANDUM OPINION**

Plaintiffs Finley Alexander Wealth Management, LLC ("Finley Alexander") and Kyle Winkfield brought this civil action against Defendant M & O Marketing, Inc. ("M&O") and individual Defendants Dennis Brown, Edward Petersmarck, and Ryan Brown. ECF No. 1. In their Amended Complaint, Plaintiffs filed claims for Fraud (Count I), Fraudulent Concealment (Count II), Tortious Interference with Contracts (Count III), Tortious Interference with Prospective Business Advantage (Count IV), Defamation Per Se (Count V), Defamation (Count VI), Invasion of Privacy False Light (Count VII), Slander (Count VIII), and Conspiracy (Count IX). ECF No. 38-2. This Court granted in part and denied in part Plaintiff's First Motion for Leave to Amend the Complaint. *See* ECF Nos. 49, 50. Now Pending before the Court is Plaintiffs' Motion for Leave to File Second Amended Complaint and an accompanying Motion to Seal. ECF Nos. 89, 90. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the following reasons, Plaintiffs' Motion for Leave to File Second Amended Complaint is granted in part and denied in part. Plaintiffs' Motion to Seal is granted.

I.   **BACKGROUND**[1]

A.  **Parties**

This Court previously discussed the background of this action in its prior Memorandum Opinion. ECF No. 49. The background is reiterated here as updated in the Second Amended Complaint. Plaintiff Finley Alexander is a financial advisory firm run by Plaintiff Winkfield, a Maryland-based financial advisor. ECF No. 89-2 ¶¶ 1, 12, 13. Plaintiffs sell investment and insurance products to Maryland-based clients. *Id.* Plaintiff Winkfield previously worked for O'Dell, Winkfield, Roseman & Shipp, LLC ("OWRS"), a predecessor to Finley Alexander also based in Maryland. *Id.* ¶ 12.

Defendant M&O is a conglomeration of at least eight entities run out of an office in Southfield, Michigan. *Id.* ¶ 14. M&O provides marketing, regulatory, compliance, and backoffice services to its clients, including developing and implementing life insurance and annuities sales strategies, coordinating local television appearances, preparing sales seminars, and providing client-specific advice for marketing to particular customers. *Id.* ¶¶ 3, 25. M&O advertises itself as "a best-in-class financial marketing behemoth offering highly skilled marketing professionals, with quality resumes and deep training." *Id.* ¶ 203.

Defendant Dennis Brown is the owner and CEO of M&O. *Id.* ¶ 15. Defendant Petersmarck is the Executive Director of Practice Development at M&O and Defendant Ryan Brown is counsel at M&O. *Id.* ¶¶ 16, 17.

B.  **Business Relationship**

In September 2014, Defendant Petersmarck cold-called Plaintiff Winkfield on behalf of M&O to solicit Plaintiff Winkfield's business. *Id.* ¶ 19. Defendant Petersmarck's cold-call was

---

[1] Unless otherwise stated, the background facts are taken from Plaintiff's proposed Second Amended Complaint, ECF No. 89-2, and are presumed to be true.

the first of a series of communications between Plaintiff Winkfield and Defendants Dennis

Brown, Petersmarck, and Ryan Brown, during which Defendants convinced Plaintiff Winkfield

that M&O was capable of providing best-in-class services. *Id.* ¶¶ 20–21, 205. As a result of the

communications between the parties and Defendants' claims of sophistication, size, and

resources, Plaintiff Winkfield chose, in February 2015, to retain M&O to provide marketing,

regulatory, compliance, and back-office services for his financial advisory business. *Id.* ¶ 24.

From the formation of the parties' business relationship in February 2015 until the

relationship ended in January 2019, Defendants and Plaintiff Winkfield remained in frequent

communication—sometimes in person in Maryland—regarding the services provided by M&O.

*Id.* ¶ 27. Defendants repeatedly emphasized during these communications that the services

M&O provided to Plaintiffs were designed to bolster and enhance Plaintiff Winkfield's

credibility as a financial advisor in the Maryland market. *Id.* ¶ 26. Throughout this period,

Plaintiffs' main contact at M&O was Defendant Petersmarck. *Id.* ¶ 43. During the parties'

business relationship, M&O was compensated based on Plaintiff Winkfield's sales to his largely

Maryland-based customers. *Id.* ¶ 27. This compensation, combined with compensation received

from Plaintiff Winkfield's former partners, accounted for a substantial portion of M&O's

revenue. *Id.* ¶ 41.

At some point during their business relationship, Plaintiffs learned information about

Defendants that was inconsistent with Defendants' claims of size, sophistication, and resources.

First, Plaintiffs learned that Defendant Petersmarck had been "convicted of gun and drug

felonies," *id.* ¶ 203, which, according to Plaintiffs, "are material" because Defendant

Petersmarck's record is "antithetical to the very sales, regulatory, and compliance services that

M&O was hired to provide." *Id.* Second, Plaintiffs discovered that Defendant Ryan Brown,

M&O's general counsel during the period relevant to this action, was Defendant Dennis Brown's son and was only barred in Michigan a few months prior to the formation of the parties' business relationship. *Id.* ¶ 218. Moreover, Plaintiffs allege that Defendant Ryan Brown's lack of qualifications led to the harm caused by the defamatory letter described below. *Id.* ¶¶ 220–21; *see infra* § I.C.2. Third, and finally, Plaintiffs state they were misled with regard to Defendants unsavory business practices like Defendant Petersmarck's drug and gun felonies and that Defendant Dennis Brown and his companies "had been sued for discrimination and theft of client funds." *Id.* ¶ 207. Plaintiffs claim this information would have prevented them from hiring Defendants had they known it beforehand. *Id.* Plaintiffs allege that the troubling information they discovered about Defendants was originally concealed from them through Defendants' use of an IT consultant, Digital Brand Management, Inc. ("DBM"). *Id.* ¶ 23. Defendants use DBM "to diminish the likelihood that the advisors [like Plaintiffs] will discover" negative information while conducting due diligence on Defendants. *Id.*

### C.  Events After the Termination of the Business Relationship

In January 2019, the parties terminated their business relationship. *Id.* ¶ 39. Plaintiffs allege that as a result of this termination, Defendants entered "into a conspiracy agreement and understanding to destroy Plaintiffs' Maryland-based business . . . by implementing four sequential attacks designed to ruin Plaintiffs' reputation[.]" *Id.* ¶ 44. First, Defendant Petermarck posted a statement on a website called Ripoff Report (the "Ripoff Post") with false fraud allegations based on confidential client information under the control of Defendant Dennis Brown and handled under "protocols and procedures" for which Ryan Brown was responsible. *Id.* ¶ 45. Second, Defendant Ryan Brown, with the blessing of Defendant Dennis Brown and using information provided by Defendant Petersmarck, sent a defamatory letter to Plaintiff

Winkfield's former OWRS partners "at a critically damaging juncture" (the "Brown Letter"). *Id.* Third, Defendants deprived Plaintiffs of their public relations advisor, Ms. Spencer-Tiemann—in the middle of the public relations mess created by Defendants—by filing a Michigan lawsuit against her. *Id.* Fourth, Defendants released confidential client information to Plaintiffs' competitor Jeff Klauenberg, an M&O client, in order to facilitate Mr. Klauenberg's attempts to win Plaintiffs' Maryland clients "through false and defamatory misstatements misrepresenting the confidential information the Defendant conspirators provided to him[.]" *Id.*

### 1. The Ripoff Post

On March 9, 2019, with the blessing of Defendants Dennis and Ryan Brown, Defendant Petersmarck anonymously posted a statement on a website called Ripoff Report, "accusing Plaintiff Winkfield of having 'attempted to defraud' a client" and "warning 'BEWARE!'" *Id.* ¶¶ 55, 58. Despite the anonymity with which the Ripoff Post was posted, Plaintiffs knew Defendant Petersmarck created the post because it included confidential financial information regarding one of Plaintiff Winkfield's clients known only to that client, Plaintiffs, and Defendants. *Id.* ¶ 56. The client denied any involvement in creating or uploading the post and Defendant Petersmarck has since admitted, on his own, and through counsel, to uploading the Ripoff Post. *Id.* ¶¶ 55, 56.

Plaintiffs allege that several statements included in the Ripoff Post were false—*e.g.*, (1) Plaintiff Winkfield "falsely promised a 'bonus' to a former Maryland client when 'there was no real 'bonus'' (there, in fact, *was* a bonus)[;]" and (2) Plaintiff Winkfield falsely promised the client would be "'made whole . . . that was simply not true'—in reality, the client *was* made

whole[.]" *Id.* ¶ 57 (emphasis in original). Defendants knew these statements to be false because Defendants "specifically assisted [Plaintiff] Winkfield in addressing the client complaint that is referenced in the Ripoff Post." *Id.* ¶¶ 139, 152, 177.

In the aftermath of the Ripoff Post, Plaintiffs lost a Maryland financial advisor, Jacob Serfas, who "felt it necessary to leave Finley Alexander because of the negative stigma that the Ripoff Post placed on the firm[.]" *Id.* ¶¶ 60–62. Plaintiffs had introduced Mr. Serfas to the financial advisory business, had spent substantial resources training him, and had received substantial commission revenue from Mr. Serfas' Maryland clients. *Id.* ¶¶ 60–62. However, despite his positive relationship with Plaintiffs, Mr. Serfas left Plaintiffs' financial advisory business to get "'out from under' the cloud over the Finley Alexander name that has now been tarnished by the Ripoff Post." *Id.* ¶¶ 60–62.

The Ripoff Post also caused Plaintiffs to lose business they would otherwise have won. "The number of clients that have decided against signing with Finley Alexander after attending one of [Plaintiff] Winkfield's seminars and scheduling an initial conference has spiked" since Defendant Petersmarck uploaded the Ripoff Post. *Id.* ¶ 64. Specifically, Plaintiffs have identified over 300 potential clients who took initial steps towards signing on with Plaintiffs— attending one of Plaintiffs' seminars and then scheduling or attending a one-on-one meeting with Plaintiff Winkfield—only to later cancel the sign-on process. *Id.* ¶¶ 65, 68, 131, 153. Cancellations of this sort were "virtually unheard of prior to the Ripoff Post." *Id.* ¶ 68. Moreover, some of these potential clients have specifically identified the Ripoff Post as the reason for ending their consideration of Plaintiffs' financial advisory services with one potential client sending an email that "his upcoming meeting was to be 'canceled! Permanently!'" and later stating to Plaintiff Winkfield that his "internet rep isn't the best … fraud man." *Id.* ¶ 66. Other

potential clients have identified the Ripoff Post as a consideration in hiring a different financial advisor. *Id.* ¶ 67.

## 2. **Defendant Ryan Brown's Defamatory Letter**

On March 25, 2019, Defendant Ryan Brown, M&O's then in-house counsel, sent a "threatening letter to Plaintiffs' former OWRS business partners" claiming that Plaintiff Winkfield and his former partners had misappropriated M&O's materials and used copyrighted materials without permission. *Id.* ¶ 46. The copyrighted materials referenced in the letter "are the insurance sales and solicitation slide shows and other written materials that Defendants prepared" as part of the services M&O provided to Plaintiffs prior to the termination of the business relationship, materials that were specifically designed to comply with Maryland law. *Id.* ¶¶ 47–48. In the year since the letter was sent, "Plaintiffs have not made any change to their materials" based on the Brown Letter, yet Defendants have not filed any of the civil or administrative actions against Plaintiffs threatened in the letter. *Id.* ¶ 49. In fact, Defendant M&O has filed a counterclaim against Plaintiffs in this case but no claim for copyright infringement despite Plaintiff alleging that they have not materially changed the marketing materials. *Id.* Plaintiffs allege that this is in part because the Brown Letter was an attempt to "shake the relationships between the OWRS partners after they left M&O." *Id.*

Defendant Ryan Brown sent the threatening letter at a time when Defendants knew that Plaintiff Winkfield and his former OWRS partners "were each particularly vulnerable, each just getting started on his own" and at a time when Plaintiff Winkfield was not in a position to defend against the actions threatened by the letter. *Id.* ¶ 50 ("the prospect of investing time and resources defending meritless copyright allegations had the potential to undermine the new

business[.]"). The Brown Letter exacerbated a tense breakup of OWRS and caused damages as it "fostered distrust among the partners, and unnecessarily required extra resources to be devoted to the breakup rather than to sales." *Id.* ¶ 226. Additionally, Plaintiffs allege that the letter was unlawful because it proposed "an unlawful forbearance agreement." *Id.* ¶ 52.

### 3. Michigan Lawsuit Against Plaintiffs' Public Relations Executive

Three weeks after the Defendants were served with the original Complaint in this case, M&O sent a demand letter to Ms. Spencer-Tiemann and then filed suit against her in Michigan seeking $1.5 million in damages. *Id.* ¶ 69.

Ms. Spencer-Tiemann is a public relations specialist who formerly worked for M&O but left that employment on November 7, 2017. *Id.* ¶ 70. While Plaintiffs were unaware that Ms. Spencer-Tiemann was bound by a two year non-compete agreement when Plaintiff Winkfield hired her, Plaintiffs, as a courtesy, asked Defendant Dennis Brown in late 2017 whether he had any objections to Plaintiffs working with Ms. Spencer-Tiemann. *Id.* ¶¶ 70–71. Defendant Dennis Brown responded that "he did *not* have *any* issue with Plaintiffs retaining Ms. Spencer-Tiemann to perform public relations services for Plaintiffs." *Id.* ¶ 72 (emphasis in original).

Defendants did not initiate litigation against Ms. Spencer-Tiemann nor seek to enforce Ms. Spencer-Tiemann's non-compete in 2017, 2018, nor in the first half of 2019. *Id.* ¶¶ 73–75. Rather, Defendants filed the Michigan lawsuit five weeks after Plaintiffs initiated this litigation. *Id.* ¶ 69. Defendants ultimately obtained an injunction prohibiting Plaintiffs from working with Ms. Spencer-Tiemann for the last three months of her two-year non-compete period, "which exacerbated the ever-increasing damages that Plaintiffs sustained from the Ripoff Post, because the injunction stopped Ms. Spencer-Tiemann from attempting to mitigate those damages." *Id.* ¶

77. Plaintiffs allege that Defendants filed the Michigan lawsuit specifically to harm Plaintiffs. *Id.* ¶ 83.

### 4.   Jeff Klauenberg's False and Defamatory Misstatements to Plaintiffs' Clients

Three months after Plaintiffs filed the instant civil action, Defendants "provided Plaintiffs' confidential list of Maryland clients to a competing Maryland financial advisor, whose business uses M&O for services, so that the competing advisor would, and did, e-mail those clients to try to lure them to switch from Plaintiffs to the M&O advisor." *Id.* ¶ 86. Specifically, Plaintiffs allege that CoreCap Advisors and CoreCap Invesments, Inc. ("Corecap")—an affiliate of M&O whose director is Defendant Dennis Brown—terminated Plaintiff Winkfield's CoreCap appointment days before the Ripoff Post was uploaded and then contacted Mr. Klauenberg, provided him with Plaintiffs' confidential list of Maryland clients, and directed Mr. Klauenberg to misappropriate those clients. *Id.* ¶¶ 88–89, 91. Consequently, Mr. Klauenberg, a competitor of Plaintiffs, sent Plaintiffs' Maryland clients a blast email (the "Klauenberg Blast E-Mail"), *id.* at 23–24,[2] introducing himself and making a sales pitch based on the claim that Plaintiff Winkfield is "overcharging his clients." *Id.* ¶¶ 90, 95. Plaintiffs label the Klauenberg Blast E-Mail as "false and defamatory" and allege that Mr. Klauenberg's misstatements are the result of Corecap providing "limited and incomplete information[.]" *Id.* ¶¶ 92, 95. Plaintiffs allege that Defendants' purpose for providing the confidential client information used by Mr. Klauenberg was "to deprive Plaintiffs of the ongoing revenues generated by these Maryland clients while simultaneously restoring the revenue stream arising from these clients to M&O." *Id.* ¶ 87.

---

[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

### D. Present Litigation

On April 10, 2020, Plaintiffs filed a Motion for Leave to Amend Complaint. ECF No. 38. The proposed Amended Complaint included claims for Fraud (Count I), Fraudulent Concealment (Count II), Tortious Interference with Contracts (Count III), Tortious Interference with Prospective Business Advantage (Count IV), Defamation Per Se (Count V), Defamation (Count VI), Invasion of Privacy False Light (Count VII), Slander (Count VIII), and Conspiracy (Count IX). ECF No. 38-2.

On March 31, 2021, this Court issued a Memorandum Opinion and Order granting in part and denying in part Plaintiffs' Amended Complaint. ECF Nos. 49, 50. This Court denied leave to amend as to the claims in Counts I, II, and III, and denied leave to amend the claims in Counts IV, V, VI, VII, and VIII that relied on the Brown Letter, the Klauenberg Blast E-mail, or the Michigan Lawsuit. The surviving claims of the Amended Complaint were Counts IV, V, VI, VII, and VIII, based on the Ripoff Post, and Count IX. *See* ECF Nos. 49, 50.

Plaintiffs have now filed the instant Motion for Leave to File Second Amended Complaint, ECF No. 89, and an accompanying Motion to Seal. ECF No. 90. The Second Amended Complaint includes the surviving claims from the first Amended Complaint (now Counts I–VI) and three new claims; a claim for Negligent Hiring, Supervision, or Retention, against M&O, Dennis Brown, and Ryan Brown (Count VII); the same claim against M&O and Dennis Brown (Count VIII), and a Negligence claim against all Defendants (Count IX). ECF No. 89-2. On April 4, 2022, Defendants M&O, Dennis Brown, and Ryan Brown, responded in opposition to both the Motion for Leave and the Motion to Seal, ECF Nos. 93, 94.[3] Plaintiffs replied on April 18, 2022. ECF Nos. 96, 97.

---

[3] Defendant Petersmarck did not file an opposition.

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 15(a)(2) provides that courts "should freely give leave" to parties to amend pleadings "when justice so requires." Fed. R. Civ. P. 15(a)(2). "This liberal rule gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006). The Fourth Circuit has "interpreted Rule 15(a) to provide that 'leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile.'" *Id.* (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986)); *see also Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 379 (4th Cir. 2012). "Futility is apparent if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards," and would therefore not survive a motion to dismiss pursuant to Rule 12(b)(6). *Davison v. Randall*, 912 F.3d 666, 690 (4th Cir. 2019) (quoting *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011)).

To state a claim that survives a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The "mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012). The Court accepts "all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). The Court must also "draw all reasonable inferences in favor of the plaintiff." *Id.* at

253 (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)). "[B]ut [the Court] need not accept the legal conclusions drawn from the facts, and . . . need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Id.* (first alteration in original) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

"Under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider exhibits, without converting the motion to dismiss to one for summary judgment." *Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 501 (D. Md. 2019) (citing *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015)). "In particular, a court may consider documents that are 'explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits . . . .'" *Id.* (ellipsis in original) (quoting *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016)). The Court may also "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166. "To be integral, a document must be one that by its very existence, and not the mere information it contains, gives rise to the legal rights asserted." *Brennan*, 361 F. Supp. 3d at 502 (emphasis and internal quotation marks omitted) (quoting *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)).

## III.    DISCUSSION

Defendants M&O, Dennis Brown, and Ryan Brown (hereinafter, "M&O Defendants") argue that this Court should deny the Motion for Leave because (1) the amendment is futile, and (2) the Court does not have personal jurisdiction over Defendants for Counts VII and VIII. ECF No. 93 at 3, 16. Defendants also state that it is unclear whether the Court should apply Michigan

law or Maryland law. ECF No. 93 at 7 ("given the uncertainty around the choice-of-law-rules …"). The Court first discusses choice of law rules, then Defendants' personal jurisdiction argument, and finally Defendants' futility argument.

### A.  Choice of Law

"Federal courts sitting in diversity must apply the substantive law of the forum state, including the forum state's choice of law rules." *Smith v. MTD Prod., Inc.*, No. CV CCB-19-1592, 2019 WL 5538273, at *2 (D. Md. Oct. 24, 2019) (quoting *Klaxon Co. v. Stentor Elect. Mfg. Co*., 313 U.S. 487, 496–97 (1941); *Colgan Air, Inc. v. Raytheon Aircraft Co*., 507 F.3d 270, 275 (4th Cir. 2007)). The Court will therefore apply Maryland choice of law rules. "For claims in tort, Maryland follows the lex loci delicti rule." *Id.* "The lex loci delicti rule provides that 'the substantive tort law of the state where the wrong occurs' governs." *Id.* (citation omitted). "Where the events giving rise to a tort action occur in more than one State, the court must apply the law of the State where the injury—the last event required to constitute the tort—occurred." *Id.* (quoting *Lab. Corp. of Am. v. Hood*, 395 Md. 608, 615 (2006)). "The Court of Appeals of Maryland has consistently reaffirmed the state's use of lex loci delicti." *See Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 624–25 (2007) ("[w]e see no reason to discontinue our adherence to the principles of lex loci delicti."); *Hood*, 395 Md. at 615 ("[u]nlike most other States ... Maryland continues to adhere generally to the lex loci delicti principle in tort cases."). The injury to Plaintiffs is alleged to have occurred in Maryland; the Court will thus follow the lex loci delicti rule and apply Maryland law to Plaintiff's claims.

### B.  Personal Jurisdiction

Defendants argue that this Court does not have personal jurisdiction over Plaintiffs' negligent hiring, supervision, or retention claims in Counts VII and VIII. ECF No. 93 at 16. The

Supreme Court has recognized two types of personal jurisdiction: general jurisdiction and specific jurisdiction. *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1779–80 (2017). "A court with general jurisdiction may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different state." *Id*. Because Defendants are residents of Michigan, M&O headquarters are in Michigan, and Plaintiff has not alleged affiliations with Maryland that are so "continuous and systemic" as to render it essentially at home in Maryland, general jurisdiction does not apply. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). The Court must therefore have specific personal jurisdiction to adjudicate Plaintiffs' claims against Defendants. "[A] court may exercise specific personal jurisdiction over a nonresident defendant . . . when the defendant has intentionally directed his tortious conduct toward the forum state, knowing that the conduct would cause harm to a forum resident." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 397–98 (4th Cir. 2003).

### 1.   Negligent Hiring, Supervision, or Retention (Count VII)

In Count VII, Plaintiffs allege a negligent hiring, supervision, or retention claim against the M&O Defendants pertaining to Defendant Petersmarck. Plaintiffs' negligence claim arises from Defendants actual or constructive knowledge of (1) Petersmarck's felony gun and drug convictions and (2) his "incompetence" as evidenced by the Ripoff Post. ECF No. 89-2 at 74–77.

Plaintiffs fail to establish how their claim relying on Defendants' actual or constructive knowledge of Petersmarck's gun and drug convictions arises from Defendants contacts with Maryland. Plaintiff does not allege that Defendants hiring, retention, or supervision occurred in Maryland; that Petersmarck was specifically hired for the Plaintiffs in Maryland; or any other harm connected to the gun and drug convictions that were directed at and consequently harmed

the Plaintiffs in Maryland. Thus, any negligent hiring, supervision, or retention claim arising from Petersmarck's felony gun and drug convictions fail for lack of personal jurisdiction.

Plaintiffs have sufficiently alleged specific personal jurisdiction for its negligent hiring, supervision, or retention claim relying on the Ripoff Post. Plaintiffs allege that Defendants have expressly aimed its conduct at Plaintiffs in Maryland by posting and ratifying the Ripoff Post, which was intended to harm Plaintiffs in Maryland where they would lose clients and sales opportunities in the state of Maryland. Plaintiffs also allege that the conduct did cause them harm where they lost "at least three hundred forty-four clients due to the harm to Plaintiffs' reputation arising from the Ripoff Post." ECF No. 89-2 ¶ 213. This is sufficient to find that this Court has specific personal jurisdiction over Defendants for this claim. *See Calder v. Jones*, 465 U.S. 783, 789 (finding that "the brunt of the harm … was suffered in California." "[P]etitioner edited an article that they knew would have a potentially devastating impact upon respondent [and that] the brunt of that injury would be felt by respondent in the State in which she lives and works[.]"). (1984). Therefore, Plaintiffs' have sufficiently alleged personal jurisdiction for Count VII as to the Ripoff Post.

### 2.   Negligent Hiring, Supervision, or Retention (Count VIII)

In Count VIII, Plaintiffs allege a negligent hiring, supervision, or retention claim against M&O and Defendant Dennis Brown pertaining to Defendant Ryan Brown. Plaintiffs' negligence claim arises from (1) Ryan Brown's employment as general counsel for M&O after being barred for only three months and (2) Ryan Brown's "incompetence" in sending the Brown Letter. Plaintiffs have failed to establish how their claim arises from Defendants' contacts with Maryland.

Similar to Defendant Petersmarck's gun and drug convictions, Plaintiffs have failed to allege how Ryan Brown's being general counsel has harmed them in Maryland. As to the Brown Letter, Plaintiffs state that it was sent from Michigan to a recipient in Virginia. ECF No. 1, Exhibit J. Therefore, unlike the Ripoff Post, it cannot be said that Defendants directed their conduct at Maryland knowing that it would cause harm to the Plaintiffs in Maryland. Thus, Plaintiffs' claim fails for lack of personal jurisdiction and the Court denies Plaintiffs' Motion for Leave to Amend Complaint as to Count VIII.[4]

## C. Futility

Defendants also argue that Plaintiffs' proposed amendments are futile because they would not survive a motion to dismiss. The Court addresses these arguments below.

### 1. Negligent Hiring, Supervision, or Retention (Counts VII and VIII)[5]

In Counts VII and VIII, Plaintiffs bring a negligent hiring, supervision, or retention claim against the M&O Defendants as it pertains to the hiring, retention, and supervision of Defendant Petersmarck (Count VII), and against Defendants M&O and Dennis Brown as it pertains to Defendant Ryan Brown (Count VIII). "To establish any cause of action in negligence, a plaintiff must show that the defendant owed him a duty of care, the defendant breached that duty, the plaintiff suffered damages, and the breach of duty was the proximate cause of the harm suffered." *Cramer v. Hous. Opportunities Comm'n of Montgomery Co.*, 304 Md. 705, 712 (1985). "Whether proximate cause exists depends, in part, on whether the general type of harm

---

[4] Plaintiffs allege that even without specific personal jurisdiction this Court has pendent jurisdiction. The Court need not discuss this argument as the Court will establish below that Plaintiffs claims are nonetheless, futile. *See* § III.C.1.b.

[5] The Court has already denied Plaintiffs' leave to amend Count VIII, but nonetheless discusses it here and denies it as futile on this basis as well.

sustained was foreseeable." *Jordan v. W. Distrib. Co.*, No. CIV.CCB-03-950, 2004 WL 1465804, at *3 (D. Md. June 25, 2004) (citation omitted).

The tort of negligent hiring, supervision, or retention "reflects the notion that, 'where an employee is expected to come into contact with the public[,]...the employer must make some reasonable inquiry before hiring or retaining the employee to ascertain his fitness, or the employer must otherwise have some basis for believing that he can rely on the employee.'" *Silver v. Wells Fargo Bank, N.A.*, No. CV MJG-16-382, 2016 WL 6962862, at *8 (D. Md. Nov. 29, 2016) (quoting *Jones v. State*, 38 A.3d 333, 343 (Md. 2012)) (citation omitted). To prevail, a plaintiff must show that the defendant employer "knew or should have known by the exercise of reasonable care that an employee was potentially dangerous and capable of inflicting harm." *Jordan*, 2004 WL 1465804, at *3 (quoting *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 751 (D. Md. 1996); *Evans v. Morsell*, 284 Md. 160, 165 (1978)). *See also Silver*, 2016 WL 6962862, at *8 ("an employer's liability in this regard is not to be reckoned simply by the happening of the injurious event. Rather, there must be a showing that the employer failed to use reasonable care in making inquiries about the potential employee, or in supervising or training the employee."). "Even if a plaintiff proves that the employer's failure to undertake a reasonable inquiry resulted in the hiring or retention of an employee, the plaintiff must further show that the hiring or retention actually caused the injury." *Jordan*, 2004 WL 1465804, at *3. "The proximate cause inquiry does not require that the particular injury suffered be foreseeable, but it does require that the general type of harm be foreseeable." *Id.* at *5.

The business relationship that exists between the parties is enough for the Court to impose a duty. *See infra* § III.C.2.a. However, Plaintiffs have not alleged facts sufficient to show

that Defendants failed to make a reasonable inquiry into the hiring, supervision, or retention of their employees and that any such failure was a proximate cause of Plaintiffs injuries.

### a. Defendant Petersmarck (Count VII)[6]

First, Plaintiffs allege that the M&O Defendants failed to make reasonable inquiry in the hiring, supervision, or retention of Defendant Petersmarck because they knew or should have known that Petersmarck had "a history of gun and drug felonies" and these felonies "would have certainly disqualified him from employment with an entity with the size and sophistication that M&O pretended to be, [as these] convictions are antithetical to the very sales, regulatory, and compliance services that Defendants were hired to provide." ECF No. 89-2 ¶ 203. Plaintiffs go on to state that "any large-scale marketing firm, as M&O claims to be, would undoubtedly run a background check on potential employees. Any routine employment background check would have evidenced Petersmarck's felony gun and drug convictions and made him ineligible for the position he holds." *Id.* ¶ 209. "Felony gun and drug convictions go to the very heart of competence, reputation, and trustworthiness, the core values that are required for a top executive at a large financial marketing company – and which M&O touts these executives can help clients attain." *Id.* ¶ 204. Plaintiffs' allegation that the M&O Defendants failed to make a reasonable inquiry is not convincing, indeed:

> the majority of courts flatly reject the contention … that where an employee is to regularly deal with the public, an inquiry into a possible criminal record is required. On the contrary, the cases hold if the employer makes adequate inquiry or otherwise has a sufficient basis to rely on the employee, there is no need to inquire about a possible criminal record.

---

[6] As discussed in § III.B.1 above, the Court does not have personal jurisdiction over this claim based on the Defendants negligence in hiring, supervising, or retaining Defendant Petersmarck in connection with his drug and gun convictions. However, because Plaintiffs' do not allege any other failure to make reasonable inquiry on behalf of the Defendants, the court nonetheless discusses its reasoning for denying the claim on these grounds as well.

*Evans v. Morsell*, 284 Md. at 167. Even if this Court were to *assume* that Plaintiffs adequately alleged that Defendants failed to make a reasonable inquiry into Petersmarck to reveal his convictions, Plaintiffs' have not shown how that failure proximately caused their injury.

Plaintiffs allege that the M&O Defendants "ratified [Petersmarck's] incompetent conduct by failing to have the Ripoff Post taken down or to have publicized a retraction, apology, or other mitigating factor in the years since it was posted, [and by] sending a coordinated cease and desist letter targeting Plaintiffs virtually simultaneously." ECF No. 89-2 ¶¶ 210–11. Plaintiffs have not alleged how a failure to conduct a routine background check, to purportedly reveal felony gun and drug convictions, would lead to Plaintiffs' injury that by its own terms, is defamation, and is based on "misappropriating confidential client financial information and publishing that information publicly[.]" *Id.* ¶ 208. "Simply because an employee might have a history of or propensity for causing one kind of injury, an employer is not on notice that the employee could cause a completely different kind of injury." *Jordan*, 2004 WL 1465804, at *5 (citing *Evans v. Morsell*, 284 Md. at 167 n.4). As such, Plaintiffs have failed to state a claim for negligent, hiring, retention, or supervision as to Count VII and the court will deny leave to amend this Count.

### b. Defendant Ryan Brown (Count VIII)

Plaintiffs allege that M&O and Dennis Brown failed to make reasonable inquiry in the hiring, supervision, or retention of Defendant Ryan Brown as "any large-scale marketing firm, as M&O claims to be, … would undoubtedly run a background check on potential employees, especially legal counsel [which would have] evidenced Ryan Brown's very recent admission to the bar, complete lack of experience as legal counsel, and incompetence to act as general

counsel[.]" ECF No. 89-2 ¶ 222. "Ryan Brown assumed the role of M&O's in-house general counsel after having only been barred for approximately three months." ECF No. 89-2 ¶ 218. Plaintiffs state "it is inconceivable that an attorney who had just recently graduated law school … would be qualified or competent to be general counsel for a self-proclaimed 'billion dollar marketing organization.'" *Id.* "An attorney with the sophistication and competence required to hold a general counsel position would have known not to send the Brown Letter proposing an illegal forbearance agreement." *Id.* ¶ 220. Notwithstanding the fact that Plaintiffs have presented no evidence to show this Court that it is unreasonable to hire a recently barred attorney to be counsel at a large company, or that such an act amounts to a failure to supervise or retain claim, Plaintiffs have failed to show how any potential failure proximately caused their injuries.

Plaintiffs allege that the Brown Letter "exacerbated the difficulties that Plaintiffs experienced during the breakup of OWRS[,] heightened tensions … [and] fostered distrust among the partners, and unnecessarily required extra resources to be devoted to the breakup rather than to sales, and … led to lost sales." *Id.* ¶ 226. At best, it appears that Plaintiffs' breakup of OWRS was already happening when the Brown letter was sent, and Plaintiffs have presented no facts to show how any failure by Defendants in hiring, supervising, or retaining a recently barred attorney, or his sending of the Brown letter could lead to an injury involving a partnership breakup and sales. As such, Plaintiffs have failed to state a claim for negligent hiring, retention, or supervision as to Ryan Brown and the Court will deny Plaintiffs leave to amend this Count.

### 2.  Negligence (Count IX)

Defendants argue that Plaintiffs' have failed to state a claim for Negligence as they have failed to allege duty on behalf of Defendants or a breach of that duty. ECF No. 93 at 16–20. To establish a negligence cause of action "a plaintiff must prove the existence of four elements: [1] a

duty owed to him (or to a class of which he is a part), [2] a breach of that duty, [3] a legally cognizable causal relationship between the breach of duty and the harm suffered [proximate cause], and [4] damages." *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 531–32 (1986) (quoting *Cramer*, 304 Md. at 712). "The duty element in a negligence action is 'an obligation to which the law will give effect and recognition to conform to a particular standard of conduct toward another.'" *Jacques*, 307 Md. at 532 (quoting J. Dooley, Modern Tort Law, § 3.03, at 18– 19 (1982, 1985 Cum. Supp.)).

> In determining whether a tort duty should be recognized in a particular context, two major considerations are: the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties. Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent. By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability.

*Id.* at 534–35. "An additional factor relevant to the determination of whether to recognize the existence of a tort duty is the nature of the business of the party upon whom the burden is sought to be imposed." *Id.* at 541. "The law generally recognizes a tort duty of due care arising from contractual dealings with professionals such as physicians, attorneys, architects, and public accountants." *Id.* Additionally, courts "have recognized that in those occupations requiring peculiar skill, a tort duty to act with reasonable care will be imposed on those who hold themselves out as possessing the requisite skill." *Id.*

### a. Duty

Plaintiffs allege that Defendants' owed Plaintiffs a duty to "provide correct and complete information, act in good faith, refrain from fraudulent and/or deceitful conduct [and to] not make disparaging statements, refrain from misappropriation of confidential client financial

21

information, and refrain from coordinated attacks aimed at destroying Plaintiffs' business." ECF No. 89-2 ¶¶ 229, 232. In sum, Plaintiffs allege that Defendants had a duty to furnish correct information, disclose material facts, and exercise reasonable care in facilitating business transactions. Plaintiffs allege that these duties arise from the "business professional relationship that existed between the parties." [7] ECF No. 89-2 ¶ 229. "The duty to furnish the correct information arises when the relationship is of the nature that one party has the right to rely upon the other for information." *Giant Food, Inc. v. Ice King, Inc.*, 74 Md. App. 183, 189 (1988). "The most common example of the duty to speak with reasonable care is based on a business or professional relationship, or one in which there is a pecuniary interest." *Id.* at 190. This Court finds that Plaintiffs have sufficiently pled a duty owed to them by Defendants.

The professional business relationship alleged between Plaintiffs and Defendants is intimate enough to impose a duty of care on Defendants. Plaintiffs allege that Defendants held themselves out to be a "best-in-class financial marketing behemoth offering highly skilled marketing professionals with quality resumes and deep training." ECF No. 89-2 ¶ 233. In September 2014, Defendant Petersmarck made a cold-call to Plaintiffs in Maryland to solicit Plaintiff Winkfield's business for M&O. *Id.* ¶ 19. Defendants stated that the services "M&O provided to Plaintiffs were designed to bolster and enhance Plaintiff Winkfield's credibility as a financial advisor in the Maryland market." *Id.* ¶ 26. Furthermore, there were numerous follow-up communications after the cold-call, and Plaintiff Mr. Winkfield was "induced to travel to Michigan for a meeting, where Defendants furthered 'the deception.'" *Id.* ¶ 205. It was after

---

[7] Plaintiffs also state that "[n]either M&O, Dennis Brown, nor Ryan Brown implemented the policies and procedures required by the applicable standard of care for owners and general counsel of financial services companies[.]" ECF No. 89-2 ¶ 59. However, since the Plaintiffs have failed to identify any specific "policies and procedures" and failed to identify what the "applicable standard of care" is, the Court assumes that Plaintiffs are alleging a standard of care arising from the business professional relationship that existed between the Parties as discussed herein.

these conversations and based on representations such as these that Plaintiffs hired Defendants.

In "February 2015, [Plaintiff Winkfield] chose to retain M&O to provide services for [his]

financial advisory business." *Id.* ¶ 24. This business relationship is intimate enough to find a duty

on behalf of Defendants where the business relationship was intended to be mutually beneficial.

The intimate nexus is further illustrated by virtue of their communications and interactions over a

period of several months (at least September 2014 through January 2019). *See Giant Food,* 74

Md. App. at 190. "What occurred over that period of time amounted to a business relationship

involving a prospective pecuniary interest on the part of both parties." *See also Jacques*, 307 Md.

at 756 (citing to *Glanzer v. Shepard*, 233 N.Y. 236, 276 (1922), finding that the weigher owed a

duty to the buyer despite the absence of a contractual duty because the weigher knew the buyer

was the intended beneficiary and would rely on the information supplied); *Odyssey Travel*

*Center, Inc. v. RO Cruises, Inc.*, 262 F. Supp. 2d 618, 628 (D. Md. 2003) (finding a duty of care

had arisen outside of the Parties' contract because the Parties had "engaged in communications

over many months" had "a pre-existing relationship" and the Defendant "had exclusive control

over material information necessary for Plaintiff to understand the situation."). Thus, the

relationship between Plaintiffs' and Defendants is sufficient for this Court to find that

Defendants owed Plaintiffs a duty to furnish correct information, disclose material facts, and

exercise reasonable care in facilitating business transactions. Defendants next argue that

Plaintiffs' have failed to allege a breach of any stated duty.

### b.  Breach

Plaintiffs allege multiple ways that Defendants have breached their duties to Plaintiffs.

Specifically, Plaintiffs allege that Defendants breached their duties by:

a.   Misleading Plaintiffs to believe that M&O is a best-in-class financial marketing behemoth offering highly skilled marketing professionals, with quality resumes and deep training;

b.   Concealing Petersmarck's felony gun and drug convictions;

c.   Misleading Plaintiffs to believe that M&O had the resources to offer highly skilled attorneys who could provide Plaintiffs much-needed guidance to navigate Maryland's complex financial and insurance regulatory landscape. Instead, its general counsel, Ryan Brown, was the CEO's son, and had only been barred for approximately three months. Upon information and belief he has since been replaced by his brother, who has even less experience;

d.   Misleading Plaintiffs to believe that M&O was larger, more sophisticated, more skilled, and had more resources than it actually possessed;

e.   Concealing Dennis Brown and his companies' past lawsuits for discrimination and theft of client funds;

f.   Misrepresenting and hiding the fact that a convicted felon was assigned to assist Plaintiffs with sales and provide regulatory and compliance advice;

g.   Misrepresenting and hiding the fact that they are affiliated with CoreCap, an entity that admitted to stealing substantial sums from its client as little as two years ago, and then refused to make its clients whole; and

h.   Misrepresenting and hiding their history of discrimination and retaliation against ex-employees.

ECF No. 89-2 ¶ 233a–h. These breaches pertain to the misstatements, misrepresentations, and concealment that Defendants engaged in to secure Plaintiffs business. Plaintiffs state that had

they known the truth of these statements, they would not have hired Defendants. This is sufficient to find a breach. *See Griesi v. Atl. Gen. Hosp. Corp.*, 360 Md. 1, 19 (2000) (finding that Plaintiffs stated a claim for negligent misrepresentation where Defendants "failed to exercise reasonable care in communicating information to [Plaintiff] that was material to his business decision[.]").

Plaintiffs also allege that Defendants breached their duties by:

a. Conspiring to destroy Plaintiffs' business;

b. Posting the Ripoff Post which contained false and defamatory statements;

c. Utilizing confidential financial information of Plaintiffs' client in the publication of the Ripoff Post;

d. Interfering with Plaintiffs' prospective business;

e. Portraying Plaintiffs in a false light to the public;

f. Creating, sending, and/or ratifying the Brown Letter which contained false and defamatory statements as well as proposal of an illegal forbearance agreement;

g. Engaging in unfair, deceptive, and unethical trade practices related to the financial and insurance industry;

h. Filing and prosecuting the Michigan Suit; and

i. Coordinating and ratifying the Klauenberg Blast E-Mail.

ECF No. 89-2 ¶ 234a–i. Plaintiffs have not alleged a breach as to (e)–(h). The alleged breach in (e) is conclusory with no specific facts attached to it. Without such factual clarification, the Court cannot presume to what act or conduct on behalf of Defendants Plaintiffs are referring to. As to (f) Plaintiffs do not assert that the Brown letter withheld or misrepresented information that affected their dealings with the Defendants, involved Defendants misrepresentation of facts to

Plaintiffs, that it involved Defendants' duties to act with reasonable care, or that it otherwise affected their business professional relationship from which Defendants' duties arise. To the extent that Plaintiff is relying on the false or defamatory statements in the letter, Plaintiffs proper claim is defamation. As to (g) this Court presumes it to be the same alleged breaches already stated in ECF No. 89-2 ¶ 233a–h, and thus will not consider the conclusory statement alleged here. Finally, in (h) Plaintiffs have failed to assert how the filing and prosecution of the Michigan suit results in a breach of Defendants duties to Plaintiffs where the suit is not against Plaintiffs and there has been no allegation of it being an effort to act unreasonably or without due care in their business relationship. The remaining alleged breaches (a)–(d), and (i), sufficiently allege breach, where all of these actions could be said to be a breach of Defendants duties to act reasonably in facilitating business transactions.

Having sufficiently pled duty and breach,[8] the Court finds that the Plaintiffs' have adequately pled a negligence claim, and in accordance with its opinion, the Court will grant Plaintiffs' Motion for Leave as to this Count.

### D.  Motion to Seal

Accompanying Plaintiffs' Motion for Leave to File Second Amended Complaint was a Motion to Seal. ECF No. 90. Local Rule 105.11 states, in relevant part that "any motion seeking the sealing of pleadings, motions, exhibits, or other documents to be filed in court record shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protection." This rule endeavors to protect the common law right to inspect and copy judicial records and documents, *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978), while recognizing that

---

[8] Defendants do not challenge the proximate cause or damages elements of Plaintiffs' negligence claim.

competing interests sometimes outweigh the public's right of access, *In re Knight Pub. Co.,* 743 F.2d 231, 235 (4th Cir. 1984). Prior to sealing any documents, the court must provide the non-moving party with notice of the request to seal and an opportunity to object. *Id.* This notice requirement may be satisfied by either notifying the persons present in the courtroom or by docketing the motion "reasonably in advance of deciding the issue." *Id.* at 234. Finally, the court should consider less drastic alternatives to sealing, such as filing redacted versions of the documents. If the court decides that sealing is appropriate, it should also provide reasons, supported by specific factual findings, for its decision to seal and for rejecting alternatives. *Id.* at 235.

Plaintiffs' seek to seal the names of third-party clients and potential clients, and two exhibits similarly identifying the names of third-parties. Defendants M&O, Dennis Brown, and Ryan Brown oppose the sealing. Plaintiffs state that to address the deficiencies in their prior Complaints they had to "identify several third-parties from whom Defendants continue to earn renumeration as well as other clients and/or potential clients of Plaintiffs." ECF No. 90 at 5. Plaintiffs' further state that these individuals have entrusted their private and confidential financial matters to the parties in this case. *Id.* Plaintiffs posit that there are no less restrictive alternatives to adequately protect the identities of these third-party individuals and the proposed redactions are limited to small portions of the Complaint. *Id.* The Court concludes that the Plaintiffs' request to seal is not overbroad. The requested sealing is a proposed redaction, limited to one paragraph of the entire 236 paragraph Second Amended Complaint and two exhibits, and the request to protect personal information is proper. *Rock v. McHugh*, 819 F. Supp. 2d 456, 475 (D. Md. 2011); *Thaxton-Tensley v. United States*, No. GJH-19-1019, 2020 WL 2794594, at *4 (D. Md. May 29, 2020); *Moore v. Washington Hosp. Ctr.*, No. CIV.A. DKC 11-3742, 2012 WL

2915165, at *7 (D. Md. July 16, 2012). Accordingly, the Court will grant Plaintiffs' motion to seal.

**IV.     CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for Leave to File Second Amended Complaint is granted in part and denied in part. Plaintiffs' Motion to Seal is granted. A separate Order follows.


Date: <u>February 21, 2023</u>                    _____/s/_____
                                                          GEORGE J. HAZEL
                                                          United States District Judge