# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

<table>
<tr><td>

**FINLEY ALEXANDER WEALTH MANAGEMENT, LLC, et al.**,

Plaintiffs,

v.

**M&O MARKETING, INC., et al.**,

Defendants.

</td><td>

Civil No. 19-1312 SAG

</td></tr>
</table>

## MEMORANDUM OPINION

The plaintiffs Finley Alexander Wealth Management, LLC ("Finley Alexander"), and the Estate of Kyle Winkfield ("Estate"),[1] brought this action against the defendants Edward Petersmarck ("Petersmarck"); his employer, M&O Marketing, Inc. ("M&O"); and M&O's CEO, Dennis Brown, alleging that the defendants had tortiously interfered with the plaintiffs' prospective business advantages and defamed Finley Alexander. After a 14-day trial, a jury returned a verdict for the plaintiffs against Petersmarck and M&O on all claims. The jury also found for Brown on all claims.

After the judgment, Petersmarck and M&O renewed their motions for judgment as a matter of law. They also each moved for a new trial, for an amendment of the judgment, and for remittitur. These post-trial motions are ripe. No hearing is necessary. *See* L.R. 105.6 (D. Md. 2023).

---

[1] In January 2023, during this litigation, Kyle Winkfield passed away. *See* Mot. for Substitution of Party, ECF 130. Soon after, the Estate substituted for him as a co-plaintiff. ECF 131.

For the following reasons, the Court will **DENY** the renewed motions for judgment as a matter of law, **GRANT IN PART** the motions for an amended judgment, **DENY** the motions for remittitur, and **DENY** the motions for a new trial.

## I. BACKGROUND

On March 8, 2019, Petersmarck, an employee of M&O, anonymously published a disparaging post about Winkfield and his company, Finley Alexander, on RipoffReport.com ("Ripoff Report"), a consumer-reporting website that will not remove a published post without a "court order following a trial." Pretrial Conf. Tr. (Oct. 17, 2024), 31:20–32:6, ECF 238.[2] Within two months, on May 3, 2019, Winkfield and Finley Alexander sued.

After a two-week trial, a jury found that Petersmarck and M&O had (a) tortiously interfered with the Estate and Finley Alexander, (b) per se defamed Finley Alexander, and (c) defamed Finley Alexander.[3] *See* Verdict Sheet, ECF 285. The jury assessed lost profits of $960,000 jointly to the Estate and Finley Alexander, as well as $180,000 of presumed damages and $170,000 in actual damages to Finley Alexander, for a total of $1,310,000 in economic damages to the plaintiffs. *See id.* The jury also assessed $2,100,000 in damages to the Estate "for personal humiliation and emotional distress." *See id.*; Jury Instructions at No. 30, ECF 274. "In addition, a Consent Judgment was awarded to Plaintiffs as punitive damages for $100,000 against Defendant Edward Petersmarck individually." Final Order of Judgment ¶ 5, ECF 309.

---

[2] "MR. KING [counsel for Petersmarck]: Your Honor, I spent several hours on the phone with Ripoff Report's in-house counsel, and there's simply no way to take [the post] down short of a court order. . . . They will respect a court order following a trial. They will not accept a stipulated order. They will fight that. The Ripoff Report is run by a gentleman out of his basement in Arizona, and he's very resistant to taking down any of these posts. We requested several times, once Winkfield had passed away, and they have said no every time."

[3] The jury found the remaining defendant, Dennis Brown, not liable on any count.

The Court entered final judgment on January 27, 2025, ECF 309, and on the same day ordered Ripoff Report to show cause why it should not remove the defamatory post, ECF 310. On February 1, 2025, Ripoff Report removed the post. *See* ECF 320-2.

The two liable defendants each moved for a new trial or to alter or amend the judgment, ECF 322 (M&O), 324 (Petersmarck), and renewed their motions for judgment as a matter of law, ECF 323 (M&O), 325 (Petersmarck). The defendants filed these motions on February 24, 2025.

The plaintiffs' responses were due on March 10. *See* L.R. 105.2 (D. Md. 2023). On March 12, the plaintiffs filed a motion for an extension. ECF 328. Their motion gave no reason for the delay but asked for one more day—three days total—to oppose the defendants' motions. *Id.* The next day, March 13, both defendants opposed the extension. ECF 329 (M&O), 332 (Petersmarck). Later that same day, the plaintiffs filed their untimely oppositions to the defendants' posttrial motions. ECF 333, 334, 335.

Two weeks later, the defendants replied in support of their posttrial motions, ECF 336, 338, 339, 340, and the plaintiffs replied in support of their motion for an extension, ECF 337.

Separately, upon the defendants' motion and their promise to post a bond consistent with this Court's Local Rule 110.1(a), ECF 321, the Court stayed the enforcement of the judgment, ECF 341.

## II. Legal Standards

### A. Motion for Judgment as a Matter of Law

Federal Rule of Civil Procedure 50 provides for two types of motions for judgment as a matter of law in civil actions tried before a jury. The first, pursuant to Rule 50(a), provides litigants the opportunity to obtain a judgment as a matter of law prior to an issue's submission to the jury. If, after a party "has been fully heard on an issue," and the court determines "that a reasonable jury

would not have a legally sufficient evidentiary basis to find for the party on that issue," the court may enter judgment against that party. Fed. R. Civ. P. 50(a)(1). The Rule further specifies that the motion "may be made at any time before the case is submitted to the jury," and "must specify the judgment sought and the law and facts that entitle the movant to the judgment." *Id.* 50(a)(2). With regard to specificity, the moving party must, "either in written or oral argument, provide[] sufficient notice to his opponent of the alleged deficiencies in the opponent's case." *Wallace v. Poulos*, 861 F. Supp. 2d 587, 595 (D. Md. 2012).

Rule 50(b) provides litigants the opportunity to renew their previous motion for judgment as a matter of law made under Rule 50(a). Specifically, Rule 50(b) provides that if a party's Rule 50(a) motion is unsuccessful, then, within twenty-eight days of the jury's verdict, the party may renew its motion for judgment as a matter of law. Fed. R. Civ. P. 50(b). As is apparent from the Rule's text, the court can entertain a Rule 50(b) motion only if the moving party made a Rule 50(a) motion before the court submitted the case to the jury. *See, e.g.*, *Price v. City of Charlotte*, 93 F.3d 1241, 1248–49 (4th Cir. 1996). If properly presented to the court, then the court may "(1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(b).

In considering a motion for judgment as a matter of law under Rule 50, the court is "compelled to accord the utmost respect to jury verdicts and tread gingerly in reviewing them." *Lack v. Wal-Mart Stores, Inc*., 240 F.3d 255, 259 (4th Cir. 2001) (quoting *Price*, 93 F.3d at 1250). The Court must view the evidence "in the light most favorable to the non-moving party," *id.*, "without weighing [its] credibility," *Chaudhry v. Gallerizzo*, 174 F.3d 394, 405 (4th Cir. 1999). The court may only grant the motion if "there is no legally sufficient evidentiary basis for a reasonable jury

to find for that party on that issue." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000) (quoting Fed. R. Civ. P. 50(a)).

**B.  Motion to Alter or Amend the Judgment**

Altering or amending the judgment is an "extraordinary remedy that should be applied sparingly." *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012) (citing *EEOC v. Lockheed Martin Corp.*, 116 F.3d 110, 112 (4th Cir. 1997)). A court will do so only "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Id.* (quoting *Zinkand v. Brown*, 478 F.3d 634, 637 (4th Cir. 2007)). To qualify for the third exception—to correct a clear error of law or prevent manifest injustice—the judgment must be more than "probably wrong; it must strike [the court] as wrong with the force of a five-week-old, unrefrigerated dead fish. It must be dead wrong." *U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Va., LLC*, 899 F.3d 236, 258 (4th Cir. 2018) (citations omitted) (interpreting the clear-error-of-law and manifest-injustice standards in the context of Rule 54(b)).

**C.  Motion for Remittitur**

"[A] remittitur, used in connection with Federal Rule of Civil Procedure 59(a), is the established method by which a trial judge can review a jury award for excessiveness." *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 593 (4th Cir. 1996). Remittitur is a process by which the trial court orders a new trial unless the plaintiff accepts a reduction in an excessive jury award. *Id.* A jury's damage award may be deemed excessive and warrant remittitur when "the damages are 'such as all mankind must be ready to exclaim against, at first blush.'" *Conklin v. Schillinger*, 257 A.2d 187, 197 (Md. 1969) (quoting *Beardmore v. Carrington* (1764) 95 Eng. Rep. 790, 793; 2 Wils. K.B. 244, 250). An award is also excessive when it is "against the

clear weight of the evidence" or "is based upon evidence which is false." *Knussman v. Maryland*, 272 F.3d 625, 639 (4th Cir. 2001) (quoting *Atlas Food*, 99 F.3d at 594). In determining whether an award is excessive, the court "may weigh the evidence and consider the credibility of the witnesses." *Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229, 1237 (4th Cir. 1995) (quoting *Poynter ex rel. Poynter v. Ratcliff*, 874 F.2d 219, 223 (4th Cir. 1989)). The decision as to whether a jury award is excessive and should be subject to remittitur is a question of law that lies within the discretion of the trial court and "will be reversed on appeal only upon a showing of abuse of discretion." *Konkel v. Bob Evans Farms Inc.*, 165 F.3d 275, 280 (4th Cir. 1999) (citing *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 438–39 (1996)); *Robles v. Prince George's Cnty.*, 302 F.3d 262, 271 (4th Cir. 2002) (quoting *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir. 1998)).

### D.  Motion for a New Trial

Federal Rule of Civil Procedure 59(a)(1)(A) provides that either party may petition the court for a new trial "on all or some of the issues" after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." This is an "extraordinary remedy which should be used sparingly." *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998). On a Rule 59(a) motion, the court must "set aside the verdict and grant a new trial if (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Knussman*, 272 F.3d at 639 (quoting *Atlas Food*, 99 F.3d at 594). The first two prongs require a "comparison of the factual record and the verdict to determine their compatibility." *Atlas Food*, 99 F.3d at 594. In this analysis, the court's review of the jury's factual determinations is limited to "whether the jury's verdict

is against the weight of the evidence or based on evidence which is false." *Id.* Ultimately, the decision of whether to grant a new trial "rests within the sound discretion of the trial court but such discretion must not be arbitrarily exercised." *City of Richmond v. Atl. Co.*, 273 F.2d 902, 916 (4th Cir. 1960).

### III.    ANALYSIS

As a threshold matter, the Court considers the plaintiffs' motion for an extension to respond. Then, the Court addresses the four forms of relief that the defendants seek: judgment as a matter of law, amendment of the judgment, remittitur, and a new trial.

Rule 6(b) of the Federal Rules of Civil Procedure governs extensions for filings. It allows for an extension "after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). The excusable-neglect standard permits courts "to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 388 (1993). Yet "'[e]xcusable neglect' is not easily demonstrated, nor was it intended to be." *Thompson v. E.I. DuPont de Nemours & Co.*, 76 F.3d 530, 534 (4th Cir. 1996). Four factors govern whether to accept a filing: prejudice to the non-movant; the length of the delay and its potential impact on the proceedings; the reason for delay, including whether it was within the movant's control; and whether the movant acted in good faith. *Pioneer*, 507 U.S. at 395; 4B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1165 (4th ed. 2018) ("Generally, excusable neglect . . . require[s] a demonstration of good faith on the part of the party seeking an extension of time and some reasonable basis for noncompliance within the time specified in the rules."). The most important of these factors is the reason for delay. *Thompson*, 76 F.3d at 534.

The three-day delay has not unduly prejudiced the defendants here, at least with respect to posttrial briefing. And to the defendants' credit, they do not argue prejudice. *See* ECF 329, 332. Relatedly, the three-day delay for the responses had little to no impact on the proceedings. As to the most important factor, the reason for the delay, the plaintiffs were slow to provide one. In their motion, the plaintiffs offered no reason for the delay. *See* ECF 328. Indeed, they proffered no facts at all. Without facts, the Court could not, at that point, assess the reason for the delay, nor could it determine whether the plaintiffs had acted in good faith. Two weeks later, in their reply, the plaintiffs explained the delay resulted from internal miscommunication and inadvertence. *See* ECF 337 at 3 ("We can offer no excuse other than we did not communicate with each other and inadvertently missed a deadline, but we did seek to remedy the delay as soon as it was recognized."). Plaintiffs' counsel are sincere in their confession. *See id.* They did not act in bad faith, which addresses the fourth factor. But, returning to the third and most important factor, the Court notes that plaintiffs' reason for the delay was *itself* delayed. The plaintiffs waited the full two weeks allowed by the Local Rules to reply and finally give their reason—and this, after the defendants had responded in opposition *within a day* of the plaintiffs' motion for an extension. Plaintiff counsel's internal miscommunications and inadvertence, even when considered with the other three factors, do not suffice to demonstrate excusable neglect.

Given the unexcused delay compounded by the tardiness in providing a reason for the delay, the Court will deny the motion, ECF 328, and strike the plaintiffs' responses, ECF 333, 334, 335. However, the Court will consider the defendants' posttrial motions on their merits in light of the trial record, with which the Court is now very familiar.

## A.  Judgment as a Matter of Law

### 1.  M&O's 50(b) Motion

To prevail on their three tort claims against M&O, the plaintiffs had to show either that Petersmarck was acting within the scope of his employment or that M&O ratified Petersmarck's post or both. *See Lewis v. Forest Pharms., Inc.*, 217 F. Supp. 2d 638 (D. Md. 2002) (first citing *Sawyer v. Humphries*, 587 A.2d 467, 470–471 (Md. 1991) (discussing an employer's vicarious liability under a scope-of-employment theory); and then citing *Citizens Bank of Md. v. Md. Indus. Finishing Co. Inc.*, 659 A.2d 313, 320 n.9 (Md. 1995) (same, but under a ratification theory)). Because a reasonable jury could find that M&O ratified Petersmarck's post, the Court need not address the alternative theory, scope of employment.

"Ratification is a longstanding doctrine of agency law that may apply to acts and transactions in a number of settings, including business settings." *Tower Oaks Blvd., LLC v. Procida*, 100 A.3d 1255, 1272 (Md. Ct. Spec. App. 2014). When an employee does not have the authority to perform a certain act, the employer may still ratify—or, essentially, approve of—that act. *Citizens Bank of Md.*, 659 A.2d at 320 n.9 (citation omitted). An employer's ratification gives the employee's act the same effect as if the employer had authorized it. *Id.* (citing Restatement (Second) of Agency § 82 (Am. L. Inst. 1958)).

"Ratification may be inferred from acquiescence, and the facts and circumstances of each case." *Maddux v. Bevan*, 39 Md. 485, 494 (1874). An employer's acquiescence to an employee's unauthorized act can be shown by the employer failing to disavow the act. *See Smith v. Merritt Sav. & Loan, Inc.*, 295 A.2d 474, 480 (Md. 1972) (citing *Maddux*, 39 Md. at 501–02 (Steward, J., concurring in part)); *Tower Oaks Blvd.*, 100 A.3d at 1273; *see also Proctor v. Metro. Money Store Corp.*, 579 F. Supp. 2d 724, 740–41 (D. Md. 2008) (noting that an employer not "promptly

reject[ing]" an employee's unauthorized act suggests ratification). Indeed, an employer's silence after an employee's unauthorized act creates a presumption of ratification. *Maddux*, 39 Md. at 497 ("Long acquiescence also, without objection, and even silence of the principal, will, in many cases, amount to a conclusive presumption of the ratification of an unauthorized act."). Relatedly, if an employer accepts the benefits of the employee's unauthorized act, that strongly suggests ratification. *See Citizens Bank of Md.*, 659 A.2d at 320 n.9. But accepting benefits is not necessary for ratification. *See id.* ("*One way* for a principal to ratify an act by conduct is to accept a benefit that it would not have received but for the previously unauthorized act." (emphasis added)); *Tower Oaks Blvd.*, 100 A.3d at 1273 ("A corporation may be found to have ratified an unauthorized act by adopting it or acquiescing in it, by accepting and retaining its benefits, *or* by failing to timely disavow or repudiate it." (emphasis added) (citations omitted)). Regardless, an employer cannot ratify an employee's act without "knowledge of the material facts." *Linden Homes, Inc. v. Larkin*, 191 A.2d 441, 443 (Md. 1963) (quotation omitted). And, importantly, an employer either ratifies the employee's act or not; there is no in-between. *Maddux*, 39 Md. at 494 ("[A] principal cannot ratify a transaction in part, and repudiate it as to the rest; he must either adopt the whole or none.").

Here, a reasonable jury could find that, given the facts and circumstances presented at trial, M&O ratified and acquiesced to Petersmarck's post. M&O knew, or at least should have known, the material facts about the post within two months of Petersmarck publishing it. *See* Pls.' Trial Ex. 1 (showing the Ripoff Report post, dated March 8, 2019); Trial Tr. vol. II, 141:16–25, ECF 294 (M&O co-owner Dennis Brown testifying that he first learned of the post when served the lawsuit); *id.* at 193:22–194:1 (M&O co-owner Denise Brown testifying that she first learned of the Ripoff Report post around when M&O was sued on May 3, 2019); ECF 10 (noting service on M&O on May 9, 2019). M&O knew its employee published the post. Trial Tr. vol. II, 96:17–23.

M&O also knew, or should have known, that the post was based on confidential information that it retained and provided to Petersmarck. *See* Pls.' Exs. 2, 3; Trial Tr. vol. III, 42:16–43:16, ECF 295. Further, M&O knew that a negative post on Ripoff Report could do damage to a company's reputation. *See* Pls.' Trial Ex. 6; Trial Tr. vol. II, 91:6–96:14. It knew it had never—in its decades of existence—posted a negative online review of any of the *thousands* of former clients. Trial Tr. vol. II, 133:14–134:2. And it knew that the post was a negative review about a former client, Trial Tr. vol. III, 211:25–212:4, a review that was, at best, outside of its stated policy but quite possibly defamatory. Yet M&O did not promptly disavow the post. In fact, M&O did not disavow it at all and did not even investigate the post. *See, e.g.*, Trial Tr. vol. II, 97:7–9. Instead, the company remained silent, doing little to nothing to repudiate the post or mitigate damages to the plaintiffs. Had M&O investigated, it would have found that Petersmarck had asked internally for confidential information about the plaintiffs *after* they no longer worked with M&O. *See* Pls.' Trial Exs. 2, 3; Trial Tr. vol. III, 42:16–44:8. And M&O would have seen that Petersmarck responded unprofessionally when another M&O employee—an "executive," at least in title, *see* Trial Tr. vol. II, 180:12–20—told Petersmarck of the post. *See* Pls.' Trial Exs. 29, 31.

Once M&O knew about the post, it reprimanded Petersmarck, but it did so lightly. *See, e.g.*, Trial Tr. vol. II, 98:13–19. Brown testified that he "believe[s] he scolded [Petersmarck], told him what an idiot he was," *id.*, and that Petersmarck "lost a lot of opportunity," *id.* at 100:21–22, but M&O "did not fire him," *id.* at 98:4, because, "[y]ou know, it was after the fact," *id.* at 155:9. M&O took Petersmarck's word that the post "was 100 percent true." *Id.* at 155:10–11. And while M&O earned no sweeping benefit from Petersmarck's defamation, it *did* avoid a detriment that could have resulted from the defamation: firing Petersmarck, a long-time, well-qualified employee, thereby avoiding the costs of losing his revenue stream and hiring another "director of

practice development." *See* Trial Tr. vol. III, 78:20–81:22 (detailing Petersmarck's extensive qual-

ifications for a role in financial services); *id.* at 81:23–82:23 (noting Petersmarck's fourteen-year-

plus tenure at M&O); *id.* at 85:7–18 (explaining Petersmarck's current role at M&O).

Ultimately, a reasonable jury could readily find that M&O, by its conduct and silence, rat-

ified Petersmarck's post. And as there is no in-between for a theory of ratification, *see Maddux*, 39

Md. at 494, M&O ratified Petersmarck's post in whole. A reasonable jury could therefore find

M&O liable, just as the jury here did.

### 2. *Petersmarck's 50(b) Motion*

Regarding Petersmarck's liability, the plaintiffs had to show, by a preponderance of the

evidence, that Petersmarck defamed Finley Alexander.

"[A] plaintiff who is not a public figure ordinarily must prove four elements to establish a

prima facie case of defamation: (1) a defamatory communication; (2) falsity; (3) fault; and

(4) harm." *Simon v. Union Hosp. of Cecil Cnty., Inc.*, 199 F.3d 1328 (4th Cir. 1999) (per curiam)

(citing *Shapiro v. Massengill*, 661 A.2d 202, 216–17 (Md. Ct. Spec. App. 1995) (Hollander, J.)).

Of these four elements, Petersmarck contests only the second, arguing that a reasonable jury could

not have found his post false. ECF 325-1 at 13.

Here, the plaintiffs submitted sufficient evidence for a reasonable jury to find the post false.

Indeed, a reasonable jury could have found at least several falsities in Petersmarck's post: (1) that

Finley Alexander attempted fraud; (2) that Winkfield attempted fraud, rather than the alleged fraud

having been a mistake on the part of M&O or both M&O and Winkfield; or (3) that Winkfield

earned and—as implied by the post—*kept* a large commission from the allegedly fraudulent trans-

action.

Petersmarck titled the post "Finley Alexander Wealth Management Kyle Winkfield Attempted annuity fraud Rockville Maryland." The post read:

> The claim is that Kyle Winkfiled [sic] and his firm, then OWRS firm, now Finley Alexander Wealth Management, attempted to defraud by moving $559,000 of money from a current annuity into a new annuity. Kyle Winkfield promised a "bonus" of $12,094 to move the money. There was a loss of money to move the $559,000 due to a "surrender charge" from the original Ohio investment where the money was invested.
>
> Kyle Winkfield promised that loss would be "made whole" in the move to his new recommendation. That was simply not true. After speaking with the new annuity carrier it was found that there was no real "bonus" to the money that was moved to Kyle Winkfield's new investment recommendation. Further, Kyle Winkfield earned a large commission in the move.
>
> After a lengthy fight with Kyle Winkfield and his office a threat to involve FINRA and the State Insurance Commissioner had to be made to get the original $559,000 returned. The $559,000 was returned without the "bonus" money Kyle Winkfield promised and the loss from the Ohio investment was not made whole. Kyle Winkfield can change the name of his company but he can't change the way he does business – BEWARE!

Pls.' Trial Ex. 1. The post refers to a transaction Winkfield facilitated for his client Patti Clements. It appears to allege that Winkfield attempted to defraud Clements by counseling her to replace one investment (an annuity with Ohio National) with another (an annuity with Athene). In this transaction, Winkfield would earn "a large commission." To induce Clements to change annuities, Winkfield promised Clements that she would earn a bonus in her new Athene annuity. Theoretically, that bonus would offset any surrender charge, or termination fee, that Clements would incur from closing her Ohio National annuity. The catch, the post said, was that there was no bonus— and Winkfield knew as much. After Clements realized the Athene annuity had no bonus, she demanded Winkfield unwind the transaction. Notably, the post does not mention forgery, nor does it

mention an "undisclosed replacement."[4] Again, the only theory of fraud it alleges is that Winkfield induced Clements to transfer her investment by lying about a bonus rider, so he would earn a commission. But credible facts submitted at trial suggest that version of events was false.

First, Finley Alexander, named in the title and the first sentence of the post, could not have attempted to defraud—it could not have attempted anything—because it did not exist at the time of the transaction referred to here: The alleged fraud occurred in March 2018, *see* Pls.' Trial Exs. 87, 88, 89, yet Finley Alexander opened ten months later in January 2019, Trial Tr. vol. V, 76:12–15, ECF 297. While Winkfield was an owner of OWRS first and Finley Alexander Wealth Management second, OWRS was not renamed as Finley Alexander Wealth Management. *See* Trial Tr. vol. V, 87:13–18. The two entities were distinct. *Id.* A reasonable jury could find, then, that Petersmarck's statement that the actions of OWRS *were* the actions of Finley Alexander—the only corporate plaintiff bringing a defamation claim—was false.

Second, a reasonable jury could have found that Winkfield did not intend to defraud anyone but instead that the Athene paperwork contained a mistake made by either M&O or M&O and Winkfield together. Petersmarck points out that Clements, the client allegedly defrauded, wanted a bonus rider on her new annuity. *See* ECF 325-1 at 14. But when Winkfield submitted the paperwork for the Athene annuity, he did not check the box for a bonus rider. *See id.* At trial, former M&O employee Lexxa Romano testified that as a case manager at M&O, *she* "should have caught"

---

[4] *Undisclosed replacement* refers to the allegedly illegal practice that can occur when replacing one annuity (Annuity A sold by Company A) with another (Annuity B sold by Company B). In the replacement, a broker sells his investor's Annuity A, takes the earnings, and uses them to buy Annuity B. But the broker does not tell Company B that to buy Annuity B he used funds acquired by selling Annuity A. The broker has replaced Annuity A with Annuity B without disclosing to Company B where the funds came from. This is an undisclosed replacement. The problem with an undisclosed replacement is that, in theory, the broker could counsel investors to replace their policies regularly, so he earns more commissions. Of course, changing policies regularly is likely not in the interest of the investors.

that mistake in the paperwork. Trial Tr. vol. II, 31:7–15. That is, the mistake was hers. And since she was an agent of M&O, the mistake was M&O's too. Romano went on to state that she "should have caught that [mistake] initially and went back to Kyle to have him complete the correct—the correct rider disclosure." *Id.* at 32:2–8. That was "part of [her] job." *Id.* Further, "[w]hen the issue with respect to Ms. Clements arose," no one "at M&O suggest[ed] that Winkfield was attempting to defraud Ms. Clements." *Id.* at 33:24–34:2. A reasonable jury had evidence to find that neither Romano nor anyone else at M&O thought Winkfield had attempted to defraud Clements when he erroneously failed to check the bonus rider box.

Third, a reasonable jury could have found that the post falsely implied that Winkfield earned *and kept* a large commission because of fraud. The jury heard evidence that any commission Winkfield earned, he returned. *See* Trial Tr. vol. II, 66:15–18, 67:7–22; Trial Tr. vol. III, 40:18–24, 48:20–22. To suggest, then, that Winkfield not only "earned a large commission in the move," Pls.' Trial Ex. 1, but never gave it back, constitutes a falsity—or at least it could to a reasonable jury.

## B.  Amendment of the Judgment: Applying the Noneconomic-Damages Cap

As the defendants posit in their Rule 59(e) motion, *see* ECF 322-1 at 17–19, Maryland's noneconomic-damages cap applies here. Its application reduces the plaintiffs' award from $2,100,000 in noneconomic damages to $860,000.

The Maryland legislature set a cap on noneconomic damages "in any action for damages for personal injury." Md. Code, Cts. & Jud. Proc. § 11-108(b)(2)(ii). Noneconomic damages include, for example, damages for mental anguish, pain and suffering, personal humiliation, and emotional distress. *See Rodriguez v. Cooper*, 182 A.3d 853, 857 (Md. 2018); *see also Murphy v. Edmonds*, 601 A.2d 102, 117 (Md. 1992) (noting that Maryland's General Assembly created this cap for "*any* cause of action for *noneconomic tort* damages" (emphases added)). And an action for

personal injury includes *any* type of personal injury—mental pain and suffering, humiliation, and emotional distress included. *Cf. Rodriguez*, 182 A.3d at 865, 867 (holding that the broad language of CJ § 11-108(b)(2)(ii) means that the statute applies to noneconomic injuries from intentional torts just as it does to noneconomic injuries from negligence). Noneconomic injuries arising from defamation are, as the defense shows, personal. *See Comm'r v. Miller*, 914 F.2d 586, 589 (4th Cir. 1990) (noting in dicta that "[u]nder Maryland law, a defamation action . . . is an action for personal injuries") (citing *N.Y., Phila. and Norfolk R.R. Co. v. Waldron*, 82 A. 709, 714 (Md. 1911)); *Waldron*, 82 A. at 714 ("A personal injury includes *libel*, *slander*, criminal conversation, seduction, and malicious prosecution; also an assault, battery, false imprisonment, or other actionable injuries to the person." (emphases added) (quotation omitted)).

The noneconomic-damages cap changes depending upon when a claim arises. CJ § 11-108(b)(2). So, some math. Actions arising between October 1, 1994, and September 30, 1995, inclusive, have a damages cap of $500,000. *Id.* § 11-108(b)(2)(i). Each following year, on October 1, the cap increases by $15,000. *Id.* § 11-108(b)(2)(ii). So claims arising on October 1, 1995, have a cap of $500,000 as the base *plus* $15,000 for the additional year, or $515,000. Claims arising on, say, December 12, 1996—after a second September-30-to-October-1 period has passed—have a cap of $500,000 *plus* 15,000 *times* 2, totaling $530,000.

Here, the $2,100,000 that the jury awarded to the Estate of Kyle Winkfield was for non-economic damages for personal injury. The verdict sheet and jury instructions show why. Where the jury awarded $2,100,000, it did so in response to this prompt: "As to the Estate of Kyle Wink-field, in addition to lost profits, you may award damages as defined in Jury Instruction No. 30. If you have found for plaintiff the Estate of Kyle Winkfield on its claim, please provide the amount of damages you award." Verdict Sheet 3. The prompt cross-references jury instruction number 30.

*Id.* Instruction 30 notes that "damages for personal humiliation and emotional distress" from the defendants' tortious interference can be for "[i]ndividuals but not entities." Jury Instructions at No. 30, ECF 274. Damages for personal humiliation and emotional distress are noneconomic damages for personal injuries. *See Rodriguez*, 182 A.3d at 857.

Jury instruction 32 confirms that the $2,100,000 award was for noneconomic damages for personal injury. Instruction 32 states that "the Estate of Kyle Winkfield is the only party with a claim for emotional distress damages." Jury Instructions at No. 32; *see Interphase Garment Sols., LLC v. Fox Television Stations, Inc.*, 566 F. Supp. 2d 460, 466 (D. Md. 2008) ("Because a corporation 'lacks cognizant ability to experience emotions, a corporation cannot suffer emotional distress . . . .'" (quoting *FDIC v. Hulsey*, 22 F.3d 1472, 1489 (10th Cir. 1994))). So, if the defendants were liable for tortious interference, the jury, "[i]n determining damages," was to "consider any mental pain and suffering, humiliation and embarrassment to which Winkfield was subjected as a direct result of the defendant[s'] conduct," that is, their "tortious interference." Jury Instructions at No. 32. These damages to the Estate of Kyle Winkfield—the only damages for Winkfield "in addition to lost profits," Verdict Sheet 3—were damages for the "mental pain and suffering, humiliation and embarrassment" that he suffered, *see* Jury Instructions at No. 32.

These damages are unquestionably noneconomic damages for personal injury. And given that, the statutory cap on noneconomic damages applies. *See* CJ § 11-108; *see also Murphy*, 601 A.2d at 117 (noting that Maryland's "General Assembly abrogated any cause of action for noneconomic tort damages in excess of $350,000[, the former cap, and thereby] removed the issue [of awarding damages beyond that cap] from the judicial arena."). Under the controlling precedent for Rule 59(e) motions, the Court must apply the statutory cap to prevent "a clear error of law." *See*

*Mayfield*, 674 F.3d at 378. To do otherwise would "be dead wrong." *U.S. Tobacco*, 899 F.3d at 258.

Now, to calculate the cap. The cause of action arose when Petersmarck published the defamatory post, March 8, 2019. *See* Pls.' Trial Ex. 1. March 8, 2019, is 24 years, 5 months, and 7 days after October 1, 1994. So 24 whole periods have passed since the Maryland's legislature set the $500,000 cap on noneconomic damages. Multiplying 24 periods by $15,000 per period, yields $360,000, which, when added to the $500,000 base cap, provides the cap for claims arising on March 8, 2019: $860,000.

The Court, therefore, will amend the judgment, reducing the noneconomic damages awarded to the Estate from $2,100,000 to $860,000, as required by statute.

## C. Remittitur of Noneconomic Damages

Reducing the noneconomic damages to $860,000—$450,000 less than the economic damages—strips the defendants' remittitur arguments of their logic. The Court will deny the defendants' motions as to their requests for remittitur.

A court may order "remittitur based on the excessiveness of compensatory damages" when the court finds that "the verdict is 'grossly excessive,' or 'shocks the conscience of the court,' or is 'inordinate' or 'outrageously excessive,' or even simply 'excessive.'" *See Exxon Mobil*, 71 A.3d at 135 (quoting *Banegura v. Taylor*, 541 A.2d 969, 976 (Md. 1988)). "[A]ll of these formulae mean substantially the same thing, the adjectives or picturesque articulations . . . that the damages are 'such as all mankind must be ready to exclaim against, at first blush.'" *Conklin v. Schillinger*, 257 A.2d 187, 197 (Md. 1969) (quoting *Beardmore v. Carrington* (1764) 95 Eng. Rep. 790, 793; 2 Wils. K.B. 244, 250); *see also Brooks v. Jenkins*, 104 A.3d 899, 917 (Md. Ct. Spec. App. 2014) (quoting *Conklin*, 257 A.2d at 197) (applying this definition to the question of remittitur). "[T]he

trial judge should extend the fullest consideration possible to the amount returned by the jury before it concludes that it shocks his conscience, is 'grossly excessive' or is 'excessive.'" *Conklin*, 257 A.2d at 197. For a more concrete measurement, the Supreme Court of Maryland has "held, at least implicitly, that one of the factors judges may consider in evaluating remittitur motions is the proportional relationship between noneconomic personal injury damages awarded and the compensatory damages deriving from the same injury." *Owens-Illinois, Inc. v. Hunter*, 875 A.2d 157, 175 (Md. Ct. Spec. App. 2005) (citing *Conklin*, 257 A.2d at 197); *see id.* at 176 (allowing trial courts to "consider[] the proportional relationship" between economic and noneconomic damages in deciding a remittitur motion); *Conklin*, 257 A.2d at 197 (comparing, implicitly, the noneconomic damages of $100,000 to the economic damages of $12,554, nearly $25 in noneconomic damages for every $3 in economic damages).

In Maryland, plaintiffs who suffered emotional injury can recover "if the injury was objectively ascertainable and was shown to be a provable consequence of the wrongful conduct." *Wheeling v. Selene Fin. LP*, 250 A.3d 197, 220 (Md. 2021) (quoting *Hoffman v. Stamper*, 867 A.2d 276, 296 (Md. 2005)). To be objectively ascertainable, the plaintiff must show *physical* effects of the *emotional* injury. *Id.* But here "the term 'physical' [is] not used in its ordinary dictionary sense." *Id.* Indeed, "the physical injury accompanying the emotional injury" can "include such things as depression, inability to work or perform household chores, loss of appetite, insomnia, nightmares, loss of weight, extreme nervousness and irritability, withdrawal from socialization, fainting, chest pains, headaches, and upset stomachs." *Id.* (quotation omitted).

As discussed, the noneconomic damages award will be reduced to $860,000. For that amount to be "excessive," it must, in light of the noneconomic injuries to Winkfield, be so absurdly

high that "all mankind" would "exclaim against [it] at first blush." *Conklin*, 257 A.2d at 197 (quotation omitted). That is not the case here. Three factors show why.

First, the plaintiffs presented credible evidence that Winkfield suffered noneconomic injuries from the defamatory post. Winkfield's widow described him as "drained more" than usual. Trial Tr. vol. V, 123:11. After he learned of the defamatory post, Winkfield was in a "constant state [of] fear," presumably, of losing his business and source of income for his wife and three young sons. *See id.* at 123:12–13. Winkfield was under "the stress, the pressure, the tension, [and] the anxiety" that flowed from the damages done to his livelihood by the defendants' defamation of him and his business. *See id.* at 123:11–13. In the wake of the defamation, Winkfield, "traumatiz[ed]," "would pick himself apart," changing "how [he] view[ed] [him]self." *See id.* at 123:19, 21–22. Though the plaintiffs offer no clinical diagnosis of depression, this credible testimony shows signs of it. But that's not all. The skepticism and rejection he suffered because of the defendants' defamation was "wearing on him" until, at home, "he didn't have much left." *See id.* at 124:3–8. Where Winkfield had been ebullient before—around his wife and his sons—he was "completely drained." *See id.* at 124:9–25. At best, his energy "ebbed and flowed." *Id.* Winkfield also withdrew socially. *E.g.*, *id.* at 125:21–23 ("We would go to my sister's house for parties and everyone knew . . . Uncle Kyle sleeps on the . . . couch."); *id.* at 126:2 ("Friends would invite him out, he didn't want to go out."). And he stopped lifting weights, a long-time hobby. *Id.* at 125:23–126:1 ("He was run down. He would start skipping the gym which if anyone knew him that man didn't skip the gym."). He became more irritable, too, having "less patience, less emotional capacity" with his sons. *Id.* at 126:13–22. Even the defendants concede, somewhat, that the damages flowing from their defamation were physical. *See* ECF 322-1 at 19 ("[T]o support noneconomic damages, the Estate's representative, Ms. Adams, asserted that Winkfield sometimes suffered

20

fatigue that she attributed to the post. At bottom, then, the action sought 'damages for personal injury,' . . . ."). In sum, Winkfield showed multiple signs of "physical injury accompanying the emotional injury," including signs of "depression," hypersomnia, "withdrawal from socialization," and "irritability." *See Wheeling*, 250 A.3d at 220.

Second, the proportional relationship between the noneconomic damages of $860,000 and the economic damages of $1,310,000 is under one to one. That is, the Estate is receiving less than $1 in noneconomic damages for every $1 in economic damages. Proportionality is not determinative. *See Owens-Illinois*, 875 A.2d at 175–76. But such a low ratio suggests that the amount of noneconomic damages here is not excessive.

Third, a jury found $2,100,000 to be the appropriate amount. Surely, then, a 59% discount is appropriate too. The trial jury, at least, would not "exclaim against" $860,000 as excessive, if it valued the Estate's noneconomic injury at 2.44 times as much.

Taken together, these three factors—the evidence of "physical" injury flowing from emotional injury, the proportionality of noneconomic to economic damages, and the jury's much larger initial award—underscore that a noneconomic-damages award of $860,000 is not excessive.

## D.  New Trial

### 1.  *M&O's 59(a) Motion Which Sought, in Part, a New Trial*

M&O does not move separately for a new trial but instead moves for a new trial as part of its motion for remittitur. *See* ECF 322-1 at 6. M&O moves for the Court to reduce the noneconomic-damages award that the plaintiffs could either accept or deny and instead opt for a new trial on noneconomic damages. *Id.* M&O's motion does not argue, however, that the verdict was "against the clear weight of the evidence," "based upon evidence which is false," or "will result in a miscarriage of justice." *See Knussman*, 272 F.3d at 639.

Given that M&O's motion seeks a new trial only in the event of remittitur, a remedy the Court will deny, *and* given that M&O's motion does not argue for a new trial under the relevant standards, the Court will deny the motion insofar as it seeks a new trial.

### 2. *Petersmarck's 59(a) Motion for a New Trial*

Petersmarck, on the other hand, explicitly moves for a new trial. *See* ECF 325. But he does not make a sufficient showing for such an "extraordinary remedy." *See Pac. Ins. Co.*, 148 F.3d at 403. While Petersmarck's motion argues why *his* evidence is convincing, *see* ECF 325-1 at 13–15, it does not argue that the verdict is against the clear weight of *all* the evidence or that the verdict is based upon false evidence, *see Knussman*, 272 F.3d at 639.

#### a. Not Against the Clear Weight of Evidence

The plaintiffs presented substantial and credible evidence that weighs against the evidence Petersmarck relies on. At trial, the plaintiffs showed that Petersmarck's post about Winkfield and Finley Alexander was false and injurious, thereby defaming their business. Of the elements of defamation, Petersmarck contests falsity; he argues that his post was true. *See* ECF 325-1 at 21 ("[T]here is no preponderance of evidence of falsity."). But credible evidence suggests otherwise. As described above, an ex-M&O employee testified that it was her role as Winkfield's case manager to catch minor errors in his paperwork. *See* Trial Tr. vol. II, 31:10–15, 32:1–8. The act Petersmarck alleged to be fraudulent—the promise to apply for a bonus rider but not checking the corresponding box in the paperwork—an M&O employee claimed as *her* mistake. *See id.* Further, evidence shows that Winkfield communicated beforehand with Clements about the risks of applying for a new annuity policy. *See* Petersmarck's Trial Ex. 54. After "previously explain[ing] in [their] meetings," Winkfield warned Clements that the financial move she wanted was likely off limits. *Id.* ("[M]ost annuity companies will refuse because of the surrender fee that you would be

assessed."). He also warned that her proposed move would incur a sizeable fee. *Id.* ("To surrender [your policy] at this stage is a computation of: $559,000 x 14.5% = $81,055. The surrender charge is $81,055. What could possibly be occurring that would make you consider upending a strategy we spent such a long-time planning, and only after 2 months of owning it? . . . To surrender this policy after 2 months would be the absolute worst thing you could do financially." (emphasis removed)). As Petersmarck points out, Winkfield went so far as to warn Clements that "[a]ny financial advisor advising this or suggesting this [funds transfer] certainly isn't looking out for [her] best interests and is culpable in fraud." *Id.* Whether Winkfield understood what legally constitutes fraud is debatable. But what is clear is that Winkfield was upfront to his client about the risks of her request. Weighing the sum of this evidence against Petersmarck's cited evidence, the Court finds the jury's verdict was not against the clear weight of evidence.

### b. Not a Miscarriage of Justice

Petersmarck additionally argues that the Court improperly denied "testimony from Clements and Petersmarck." ECF 325-1 at 15. In effect, Petersmarck asserts that the Court's exclusion of testimony from Clements generally and testimony from Petersmarck specifically about possible forgery "will result in a miscarriage of justice" unless the Court now orders a new trial. *See Knussman*, 272 F.3d at 639. Not so.

A trial court has discretion to exclude evidence that it deems irrelevant. *See Greenidge v. Ruffin*, 927 F.2d 789, 791–92 (4th Cir. 1991). Likewise, a court has discretion to exclude evidence belatedly offered "to ensure that there would be no unfair surprise at trial." *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 397–98 (4th Cir. 2014) (affirming the exclusion of evidence disclosed "just two months before trial"). A court may even exclude relevant evidence if that

evidence's "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, [or] undue delay." Fed. R. Evid. 403.

Some additional backstory is warranted here. At the pretrial conference in October 2024, the plaintiffs presented four unauthenticated documents they intended to enter as evidence. Pretrial Conf. Tr. 34:11–12. Three of those documents were letters purportedly written by Clements. *See id.* The defendants refused to authenticate the letters, alleging that they looked forged. *See id.* at 34:7–9, 39:14–16. So Judge Messitte directed plaintiffs' counsel to depose Clements as soon as possible to determine whether the letters were authentic. *Id.* at 38:22–24. Plaintiffs' counsel emailed Clements, asking for a convenient date. ECF 242 at 2. She did not reply. *Id.* Plaintiffs' counsel called Clements and left a voicemail. *Id.* She still did not reply. *Id.* Plaintiffs then served Clements, apprising her of the time and location of her deposition. *Id.* Clements did not attend the deposition. Trial Tr. vol. I, 5:19–22, ECF 293. Clements did, however, meet with defense counsel independently and purportedly provided them with an affidavit regarding the authenticity of one of the three letters. ECF 239-4. Defense counsel presented that affidavit to Judge Messitte a week before trial. *See id.*

Judge Messitte, in his discretion, excluded the affidavit presented by the defendants, the three letters presented by the plaintiffs, and Clements as a witness, unless the plaintiffs tried to authenticate one of the letters, in which case the defendants could call Clements "to deny it and say nothing more." *See* Trial Tr. vol. I, 7:19–9:2, 14:19–15:4, 16:9–21. Judge Messitte excluded the letters, the affidavit, and Clements's testimony for several reasons: The letters were neither relevant nor authenticated. *See id.* at 7:18–8:11. And they, along with the affidavit and Clements's possible testimony, were proffered "too late in the game." *Id.* at 14:6–17. Opposing counsel (and the Court) had relied on the joint pretrial order to understand the issues to be resolved before the

jury. *Id.* at 11:17–24. At such a late stage, no amendments to that order or to the impending trial were warranted. *See id.* at 14:6–8. Further, the letters were clearly insufficiently probative in the eyes of either party during the first five years of the case. Neither party had attempted to verify or disprove the letters until days before trial. *Id.* at 14:6–17. Introducing an underdeveloped argument as to the authenticity of Clements's signature would risk "confusing the issues, misleading the jury, undue delay, [or] wasting time." *Huskey v. Ethicon, Inc.*, 848 F.3d 151, 159–61 (4th Cir. 2017) (quoting Fed. R. Evid. 403); *see* Trial Tr. vol. I, 8:3–20. Accordingly, Judge Messitte also excluded the affidavit, which has no relevance without the letter it references. *See* Trial Tr. vol. I, 8:21–25 (Judge Messitte ruling that, unless plaintiffs tried to enter one of the barred letters into evidence, Clements was "out of the case").

Additionally, as to Clements, Petersmarck is far too late to claim that her testimony was necessary for justice. This case began in May 2019. A central issue is and has always been whether Petersmarck's post was false. His post claimed that the plaintiffs had attempted to defraud Clements. The plaintiffs, in turn, sued for defamation. Defamation requires falsity. So, were Petersmarck able to prove his post to be true, he would not be liable for defamation. Presumably, Clements, as the alleged victim, was best suited to testify regarding the post's truth. Yet the defendants never deposed Clements. ECF 325-1 at 15. That was their choice, a choice they stuck by for an overwhelming majority of this case's duration. *See* ECF 233; *see also* Pretrial Conf. Tr., 43:9–10 (King, Petersmarck's counsel, stating: "I've never spoken to Ms. Clements, and no one from my office has spoken to Ms. Clements"). While Petersmarck had mentioned mismatched signatures before, he had only done so in a footnote in his motion for summary judgment. ECF 139-1 at 31 n.9. Unsurprisingly then, after more than five years of litigation and less than three weeks before trial, the defendants *still* did not include Clements in their jointly proposed pretrial order. *See* ECF 233

at 15. Evidently, she was not that important to their case. For his part, Judge Messitte, who presided over the pretrial hearing and the jury trial, "was surprised that this woman was not going to be a witness in the case." Pretrial Conf. Tr., 37:22–24. Finally, only four days before trial, Petersmarck first asserted that he would call Clements to testify. ECF 247. Again, this came far too late. To now claim that "[h]ad the jury been permitted to hear from Clements . . . they could not have reasonably concluded that the post was false," ECF 325-1 at 17, contradicts years of Petersmarck's own choices. Judge Messitte was well within his discretion to prevent such an "unfair surprise." *See Russell*, 763 F.3d at 397. The miscarriage of justice would be to *allow* Petersmarck to add a witness four days before trial after five years of lead time. This argument for a new trial based on the exclusion of Clements's testimony fails.

Petersmarck continues to argue, though, that the Court should have at least allowed the jury to review Clements's signatures. ECF 325-1 at 17. He claims that had a reasonable jury compared the signatures on certain documents, it would have not only found inconsistencies in the signatures but also concluded that Winkfield forged them. *See id.* at 17–18. This theory is speculative at best, hardly adequate to warrant a new trial. Recall, too, that Petersmarck did not allege forgery in his post. Instead, the post alleged that Winkfield "attempted to defraud" Clements by "promis[ing] a 'bonus'" that he knew was unavailable to earn himself "a large commission." *See supra* Part III(A)(2). This theory of fraud hinges on a promised-but-nonexistent bonus, not on forgery. So even if Petersmarck proved forgery, he may not have proved that his post was true. And truth is his only argument against defamation. Additionally, in reexamining the signatures, the Court finds that the alleged discrepancy is not nearly as clear as Petersmarck would suggest. *Compare* Petersmarck's Trial Ex. 38 at M&O003384_0021 (containing a signature on the "Product Comparison Worksheet"), *with id.* at M&O003384_0019 (containing a signature that appears

reasonably similar). A reasonable jury could find that no forgery occurred at all, let alone forgery by Winkfield. Plus, as stated before, Petersmarck first adequately raised the notion of forgery just days before trial, despite years to gather evidence on possible forgery and argue the issue before the Court.[5] Introducing evidence as a basis for an underdeveloped argument of forgery may well have misled the jury into thinking the validity of the signature determined the truth of the post. It did not.

Lastly, Petersmarck relies on more speculation to argue that the Court's instruction concerning undisclosed replacements confused the jury. *See* ECF 325-1 at 20.[6] To prove his point, he cites a note from the jury that asked, among other things, for "the legal definition of 'undisclosed replacement.'" Trial Tr. vol. XI, 8:11–12, ECF 303. Petersmarck argued that the Court should point the jury to a certain exhibit that discussed undisclosed replacements. *Id.* at 8:20–25. The Court found that the suggested document did not fully define "undisclosed replacement," *see id.* at 10:5–10, and further, that his pointing to any document could imply impermissible guidance from the Court, *see id.* at 14:21–15:3. To answer the jury, the Court responded neutrally: "Use your best judgment." *Id.* at 18:20. This response was not, as Petersmarck suggests, an improper instruction. It is no basis for overturning the jury verdict here. Further still, as with the theory of forgery above, the theory of an undisclosed replacement as fraud does not suffice to show the truth of Petersmarck's post. Again, the post alleged a fraud via a promised-but-nonexistent bonus. *See supra* Part III(A)(2). The post says nothing of an undisclosed replacement. So even if Petersmarck proved that Winkfield had made an undisclosed replacement, he would not prove the fraud he alleged in

---

[5] Petersmarck noted allegedly mismatched signatures in support of his motion for summary judgment. ECF 139-1. But he did so in a footnote—far from a developed argument. *Id.* at 31. To the Court's knowledge, Petersmarck never expanded his assertion of forgery until within days of trial.

[6] *See supra* note 4 (defining *undisclosed replacement*).

the post. Note, too, that an *undisclosed* replacement would not harm Clements any more than a *disclosed* replacement would. Undisclosed replacements defraud *companies* like Athene because the companies pay brokers more in commissions. Any replacement, disclosed or not, might require an investor to pay a surrender charge for closing an annuity too early. Yet that surrender charge harms the investor regardless of disclosure to the new company. Petersmarck's theory that the alleged fraud occurred by way of an undisclosed replacement does not pass muster.

Having considered the full record, the Court finds no basis to upset the jury's verdict and grant a new trial. The Court is satisfied that the verdict is neither against the clear weight of evidence nor based upon false evidence. Likewise, despite Petersmarck's contention of bias, the Court finds that the verdict did not result in a miscarriage of justice. Accordingly, the Court will deny Petersmarck's motion for a new trial.

## IV. CONCLUSION

For the reasons above, the Court will **DENY** the plaintiffs' motion for an extension, ECF 328, and **STRIKE** the plaintiffs' responses in opposition to posttrial briefing, ECF 333, 334, 335. The Court will **GRANT IN PART** M&O's motion for remittitur or to amend the judgment, ECF 322, and Petersmarck's motion for remittitur or to amend the judgment, ECF 324. The Court will **DENY** M&O's motion for judgment as a matter of law, ECF 323, and Petersmarck's motion for judgment as a matter of law or a new trial, ECF 325. Separate orders will issue.

June 5, 2025                                    /s/
                                    _____
                                    **STEPHANIE A. GALLAGHER**
                                    **UNITED STATES DISTRICT JUDGE**